# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF TEXAS
# DALLAS DIVISION

**Civil No. 3-15-CV-03521-N**
**Criminal No. 3-13-CR-00076-N**

## *United States of America, Plaintiff-Respondent*
## *v.*
## *Michael David Carroll, Defendant-Movant*

## Brief in Support of Motion to Vacate, Set Aside, or Correct Sentence under 28 U.S.C. § 2255

**Kristin R. Brown**
**18208 Preston Road**
**Dallas, TX 75252**
**Phone: 214-446-3909**
**Fax: 214-481-4868**
**kbrown@idefenddfw.com**
Texas Bar No. 24081458

**Michael Mowla**
**P.O. Box 868**
**Cedar Hill, TX 75106**
**Phone: 972-795-2401**
**Fax: 972-692-6636**
**michael@mowlalaw.com**
**Texas Bar No. 24048680**
**Attorneys for Movant**

1

## I.      Table of Contents

**I.**      Table of Contents ................................................................................................. 2

**II.**     Table of Authorities ............................................................................................ 4

**III.**    Appendix .............................................................................................................. 6

**IV.**     Confinement, Restraint, and Requested Relief ................................................... 9

**V.**      Procedural History and Facts .............................................................................. 9

    **1.**      Procedural history of the case leading to the entry of the *Judgment in a Criminal Case* ..................................................................................................... 9

    **2.**      Appeal before the Fifth Circuit ......................................................................... 10

    **3.**      The facts in this case are extensive and Movant incorporates the declaration and documents contained in the Appendix into this Brief in their entirety ....................................................................................................... 10

**VI.**     Grounds for Relief and Argument – (Grounds 1 and 2 combined): Movant's guilty plea was involuntary or uninformed because he received incorrect advice from trial counsel (ineffective assistance of counsel) on the issue of whether when determining Movant's sentence, the court would consider uncharged relevant conduct, with the ineffective assistance of trial counsel occurring because trial counsel failed to object to numerous instances of incorrect restitution, sophisticated means, number of alleged complaining witnesses, and amount of the actual loss of each alleged complaining witness ............................................................... 11

    **1.**      Movant is entitled to assert the grounds raised in this § 2255 Motion ........................... 11

    **2.**      Standards for attacking a guilty plea on collateral review based on incorrect advice provided by trial counsel ..................................................... 12

    **3.**      Summary of: (1) trial counsel's incorrect advice to Movant, (2) trial counsel's failure to object to numerous instances of incorrect total loss and restitution, sophisticated means, number of alleged complaining witnesses, and amount of actual loss of each alleged complaining witness; and (3) the resulting prejudice to Movant. ..................................... 14

    **4.**      Construction and other costs of startup ............................................................. 17

        **i.**      Yuri Gampel .......................................................................................... 17

        **ii.**     Alyson Corral ....................................................................................... 19

        **iii.**    Leo Martinez ........................................................................................ 19

        **iv.**     Eddie Chen ............................................................................................ 20

    **5.**      Buildout Allowances ......................................................................................... 21

**6.**     Franchise Fees and Royalties ......................................................... 21

    **i.**     Yuri Gampel ............................................................................ 23

    **ii.**    Alyson Corral ......................................................................... 24

    **iii.**   Leo Martinez ........................................................................... 24

    **iv.**    Eddie Chen .............................................................................. 24

    **v.**     Henry and Mason Crane .......................................................... 25

    **vi.**    Juan Ledesma .......................................................................... 25

    **vii.**   Tina Nguyen ............................................................................ 26

    **viii.**  Bertrand Brown ....................................................................... 26

**7.**     Had Movant received effective trial counsel, the total actual loss would have been not more than $819,018, and the total number of complaining witnesses would have been no more than eight .............................. 26

**8.**     Movant's guilty plea was involuntary or uninformed because he received incorrect advice from trial counsel on the issue of whether when determining Movant's sentence, the court would consider uncharged relevant conduct, with the ineffective assistance of trial counsel occurring because trial counsel failed to object to numerous instances of incorrect restitution, sophisticated means, number of alleged complaining witnesses, and amount of the actual loss of each alleged complaining witness ................................................................. 27

**VII.**   Conclusion and Prayer ..................................................................... 31

**VIII.**  Certificate of Service ....................................................................... 32

## II.    Table of Authorities

### Cases

*Bennigan's Franchising Co., L.P. v. Swigonski*, 2008 U.S. Dist. LEXIS 14871
(N.D. Tex., Feb. 26, 2008) ................................................................... 21

*Fisher v. Wainwright*, 584 F.2d 691 (5th Cir. 1978) ............................. 13, 31

*Hill v. Lockhart*, 474 U.S. 52 (1985) .................................................... 13, 31

*Hinton v. Alabama*, 134 S.Ct. 1081 (2014) ................................................. 13

*Kimmelman v. Morrison*, 477 U.S. 365 (1986) ........................................... 14

*Mangum v. Hargett*, 67 F.3d 80 (5th Cir. 1995) ......................................... 13

*Massaro v. United States*, 538 U.S. 500 (2003) .......................................... 12

*Montoya v. Johnson*, 226 F.3d 399 (5th Cir. 2000), *cert. denied*, 532 U.S. 1067
(2001) ..................................................................................................... 12

*States v. Green*, 882 F.2d 999 (5th Cir. 1989) ........................................... 13

*Strickland v. Washington*, 466 U.S. 668 (1984) ................................... 13, 30

*TGI Friday's, Inc. v. Great Northwest Rests., Inc.*, 652 F.Supp.2d 763 (N.D. Tex.
2009) ....................................................................................................... 21

*United States v. Amaya*, 111 F.3d 386 (5th Cir. 1997) ............................... 13

*United States v. Cervantes*, 132 F.3d 1106 (5th Cir. 1998) ........................ 11

*United States v. Gaudet*, 81 F.3d 585 (5th Cir. 1996) ................................. 11

*United States v. Hernandez*, 234 F.3d 252 (5th Cir. 2000) .......................... 12

*United States v. Juarez*, 672 F.3d 381 (5th Cir. 2012) ................................ 13

*United States v. Kallestad*, 236 F.3d 225 (5th Cir. 2000) ........................... 12

*United States v. Klein*, 543 F.3d 206 (5th Cir. Tex. 2008) ..................... 15, 16

*United States v. Placente*, 81 F.3d 555 (5th Cir. 1996) .............................. 11

*United States v. Shaid*, 937 F.2d 228 (5th Cir. 1991) (en banc) .................. 11

*United States v. Smith*, 844 F.2d 203 (5th Cir. 1988) .............................. 13, 31

*Williams v. Taylor*, 529 U.S. 362 (2000) ................................................... 13

### Statutes

18 U.S.C. § 1343 (2010) ............................................................................ 10

28 U.S.C. § 2255 (2015) ............................................................................ 12

**Other Authorities**

*Understanding the Economics of Franchising and the Laws that Regulate It*, 26
    Franchise L.J. 55 (2006) ................................................................................ 22

**Rules**

U.S.S.G. § 2 (2013) ........................................................................................... 14, 17

**Constitutional Provisions**

U.S. Const. Amend. VI ............................................................................................ 31

III.  **Appendix**

- Declaration of Movant (App. 001-016)

- Chart provided to Movant by trial counsel in which trial counsel showed Movant that under the sentencing guidelines, the government's calculation of a level 28 was incorrect (App. 017)

- Emails dated September 11, 2013 beginning at 6:44 p.m. between trial counsel and Movant in which trial counsel included the loss amount alleged by Benavides of $919,032.77.  (App. 018-021)

- Emails dated September 12, 2013, beginning at 5:30 p.m. between trial counsel and Movant. (App. 022-027)

- Email dated September 12, 2013 at 5:48 p.m. between trial counsel and Movant (App. 028).

- Snapshot breakdown of actual losses to the franchisees (App. 029-031).

- Documents showing portion of the funds received from Gampel used for covered costs paid to Charlie's Fixtures in the amount of $4,133.56. (App. 032-036)

- Document showing portion of the funds received from Gampel used for covered costs paid for three refrigerators from Samsung Fixtures totaling $10,818.  (App. 037)

- Document showing portion of the funds received from Gampel used for covered costs paid for the services of an architect, as required by the lease with the property owner, Milan, totaling $4,800. (App. 038)

- Document showing a portion of the funds received from Gampel used for covered costs paid for signage totaling $5,113.02, for the restaurant at 302 N. Canon Drive, Beverly Hills, California 90210. (App. 039)

- Documents showing a portion of the funds received from Gampel used for covered costs paid for construction, provided by Numa Brothers Construction in the amount of $47,800. (App. 040-043)

- Documents showing a portion of the funds received from Gampel used for covered costs for building permits on the Beverly Hills location in the amount of $7,339.56. (App. 044-053)

- Documents showing a portion of the funds received from Gampel used for covered costs of rent on the Beverly Hills location for the months of June and July 2010 totaling $25,216.74. (App. 054-055)

- Documents showing a portion of the funds received from Gampel used for covered costs of bar stools for the Beverly Hills location, totaling $730.94.  (App. 056-061).

- Documents showing a portion of the funds received from Gampel used for covered costs of equipment from Star Restaurant Equipment in the amount of $265.54. (App. 062-063).

6

- Documents showing a portion of the funds received from Gampel used for covered costs of startup foodstuff for the Beverly Hills location totaling $3,023.26. (App. 064-069, 083).

- Documents showing a portion of the funds received from Gampel used for covered travel costs totaling $3,292.03 for the corporate staff to the Beverly Hills location during the final months of construction and training, which (according to the franchise agreements) are what franchise fees are to cover in part. (App. 069-079)

- Documents showing a portion of the funds received from Gampel used for costs of miscellaneous supplies for the Beverly Hills location totaling $923.38. (App. 080-081)

- Document showing a portion of the funds received from Gampel used for costs of electricity during the final month or two of construction on the Beverly Hills location totaling $1,833.99. (App. 082)

- Documents showing the tenant buildout allowance for Gampel with regard to the Fort Bliss location in the amount of $117,888.50.  (App. 084-146)

- Documents showing a portion of the funds received from Alyson Corral for the Western Center location covered costs of a point of sale system from T3, totaling $7,775.07. (App. 147-149)

- Documents showing a portion of the funds received from Alyson Corral for covered costs of the construction plan review by the City of Fort Worth, totaling $200. (App. 150-156)

- Documents showing a portion of the funds received from Alyson Corral for the Western Center location covered costs of construction totaling $70,875. (App. 157-159)

- Documents showing that Leo Martinez purchased a "right of refusal" as to the Fort Bliss location for $25,000.   He declined to exercise that right, and the $25,000 was refunded to him via cashier's check. (App. 160-163)

- Documents showing that a portion of the funds received from Leo Martinez was used for the Aurora location, covering costs of construction totaling $84,974.77. (App. 164-165)

- Documents showing that a portion of the funds received from Leo Martinez was used for the Aurora location, covering costs of a point of sale system from T3, totaling $9,697.46. (App. 166-168)

- Documents showing that a portion of the funds received from Leo Martinez was used for the Aurora location, covering costs of smallwares from Sysco totaling $1,123.61. (App. 169-170).

- Documents showing that Chen purchased one Salad Bowl franchise from Movant, to be built-out in the ice-rink area of the Galleria Mall in Dallas.  (App. 171-177)

- Documents showing that Movant hired K & K Construction to perform the estimated $125,000 in construction work as part of the necessary built-out of the rough location. (App. 180–181).

7

- Salad Bowl Franchise Disclosure Document (App. 182-237).

- Salad Bowl standard Franchise Agreement (App. 238-342)

- Documents showing that Martinez paid a $25,000 franchise fee for the Aurora, Colorado location, and paid an additional $25,000 for a "right of refusal" option on a location on Fort Bliss (El Paso), Texas.  (App. 343-346).

- Documents showing that on July 9, 2010, The Salad Bowl and Nguyen executed a "Mutual Termination Agreement" and Nguyen's $25,000 franchise fee was refunded. (App. 347-350).

- Documents showing that on August 20, 2010, The Salad Bowl and Brown executed a "Mutual Termination Agreement" and Brown's $25,000 franchise fee was refunded. (App. 351-352).

- Documents showing that in the Franchise Agreement between Salad Bowl and Martinez, dated February 12, 2010, Martinez agreed that the $25,000 franchise fee was fully earned upon his signing of the agreement.  (App. 353-424).

- *Judgment in a Criminal Case* (App. 425-431)

- Information (App. 432-435)

- Plea Agreement (App. 436-441)

- Plea Agreement Supplement (App. 442-444)

- Factual Resume (App. 445-450)

- Arraignment, April 4, 2013 (App. 451-473)

- Sentencing Hearing, March 17, 2014 (App. 474-538)

- Appellant's Brief filed in Fifth Circuit by appellate counsel (App. 539-557)

- Government's motion for summary affirmance filed in Fifth Circuit (App. 558-563)

- Order entered by Fifth Circuit on August 7, 2014 granting Government's motion for summary affirmance (App. 564-566)

Movant Michael David Carroll presents this Brief in support of the *Motion to Vacate, Set Aside, or Correct Sentence under 28 U.S.C. § 2255*:

## IV.   Confinement, Restraint, and Requested Relief

Movant is illegally confined and restrained of his liberty by the Federal Bureau of Prisons under a *Judgment in a Criminal Case* (App. 425-431) imposed on March 17, 2013, and signed on March 21, 2013. Under 18 U.S.C. § 1343 (2010), Movant was convicted of Wire Fraud. Movant was sentenced to 70 months in the Bureau of Prisons.  (App. 426).   In addition, Movant was sentenced to two years of supervised release. (App. 427).

Movant respectfully requests that: (1) the relief requested in this motion be granted, (2) the Court find that Movant's guilty plea was involuntary or uninformed because he received incorrect advice from trial counsel (ineffective assistance of counsel) on the issue of whether when determining Movant's sentence, the court would consider uncharged relevant conduct, with the ineffective assistance of trial counsel occurring because trial counsel failed to object to numerous instances of incorrect restitution, sophisticated means, number of alleged complaining witnesses, and amount of the actual loss of each alleged complaining witness; (3) the *Judgment in a Criminal Case* (App. 425-431) be overturned, (4) his sentence be set aside, (5) he be resentenced per the sentencing guidelines based on the arguments contained in this brief, and (6) he be immediately released from confinement and constraint.

## V.   Procedural History and Facts

### 1.   Procedural history of the case leading to the entry of the *Judgment in a Criminal Case*

On March 4, 2013, Movant was charged by information under 18 U.S.C. § 1343 (2010) with one count of Wire Fraud. (App. 432-435).   On the same day, Movant entered into a plea

9

agreement, in which he pleaded guilty to the Wire Fraud.  (App. 435-450).  Movant agreed to waive his rights to: (1) direct appeal, (2) contest his conviction and sentence in any collateral proceeding, including proceedings under 28 U.S.C. § 2241 and 28 U.S.C. § 2255, except that he reserved the right to: "(a) to bring a direct appeal of (i) a sentence exceeding the statutory maximum punishment, or (ii) an arithmetic error at sentencing, (b) to challenge the voluntariness of his plea of guilty or this waiver, and (c) to bring a claim of ineffective assistance of counsel." (App. 439).

On April 4, 2013, Movant was arraigned before the magistrate judge, and entered the plea of guilty.  (App. 451-473).  On March 17, 2014, a sentencing hearing was held before the district judge, and Movant was sentenced to 70 months in prison.  (App. 474-538).

### 2.  Appeal before the Fifth Circuit

Despite the waiver contained in the Plea Agreement (App. 439), Movant's appellate counsel files an Appellate Brief (App. 539-557) in which the issue was "(Movant's) guilty plea was unknowingly made because he was not advised that the court would consider uncharged relevant conduct that greatly increased his sentence."  Because this issue clearly fell outside of the waiver contained in the Plea Agreement, the Government filed a motion for summary affirmance (App. 558-563).  On August 7, 2014, the Fifth Circuit granted the Government's motion. (App. 564-566).

### 3.  The facts in this case are extensive and Movant incorporates the declaration and documents contained in the Appendix into this Brief in their entirety.

The facts supporting the requested relief are too lengthy and complex to detail here, so Movant directs this court's attention to pages 001-424 of the Appendix. The attached declaration

and documents are incorporated into this Brief in their entirety. These facts detail trial counsel's incorrect advice to Movant, and include the failure to object to numerous instances of incorrect restitution, sophisticated means, number of alleged complaining witnesses, and amount of actual loss of each alleged complaining witness.

**VI.** **Grounds for Relief and Argument – (Grounds 1 and 2 combined): Movant's guilty plea was involuntary or uninformed because he received incorrect advice from trial counsel (ineffective assistance of counsel) on the issue of whether when determining Movant's sentence, the court would consider uncharged relevant conduct, with the ineffective assistance of trial counsel occurring because trial counsel failed to object to numerous instances of incorrect restitution, sophisticated means, number of alleged complaining witnesses, and amount of the actual loss of each alleged complaining witness**

**1. Movant is entitled to assert the grounds raised in this § 2255 Motion**

Relief under 28 U.S.C. § 2255 is allowed for violations of constitutional magnitude that could not have been raised on direct appeal.  *United States v. Gaudet*, 81 F.3d 585, 589 (5th Cir. 1996); *United States v. Shaid*, 937 F.2d 228, 231 (5th Cir. 1991) (en banc); *United States v. Cervantes*, 132 F.3d 1106, 1109 (5th Cir. 1998). A movant may collaterally attack a conviction under § 2255 on grounds of error omitted from the direct appeals upon showing "cause" for the omission and "actual prejudice" resulting from the asserted error. *Id*. at 232.  A motion filed under § 2255 provides relief from a federal criminal conviction if the movant can show: (1) the sentence was imposed in violation of the Constitution or laws of the United States, (2) the sentencing court was without jurisdiction to impose the sentence, (3) the sentence was in excess of the maximum authorized by law, or (4) the sentence is otherwise subject to collateral attack. *United States v. Placente*, 81 F.3d 555, 558 (5th Cir. 1996); *see* 28 U.S.C. § 2255 (2015).

In this petition, Movant raises two grounds that are intertwined, that his guilty plea was involuntary or uninformed because he received incorrect advice from trial counsel (ineffective

11

assistance of counsel) on the issue of whether when determining Movant's sentence, the court would consider uncharged relevant conduct, with the ineffective assistance of trial counsel occurring because trial counsel failed to object to numerous instances of incorrect restitution, sophisticated means, number of alleged complaining witnesses, and amount of the actual loss of each alleged complaining witness.

Neither ground raised in this motion could have been raised on direct appeal: "There is no procedural default for failure to raise an ineffective-assistance claim on direct appeal because requiring a defendant to bring [such] claims on direct appeal does not promote the objectives" of the procedural default doctrine, "to conserve judicial resources and to respect the law's important interest in the finality of judgments." *Massaro v. United States*, 538 U.S. 500, 503-504 (2003). And, a showing of ineffective assistance of counsel satisfies the cause and prejudice standard. *United States v. Kallestad*, 236 F.3d 225, 227 (5th Cir. 2000). Further, the record from trial was not adequately developed for such a claim on direct appeal.

## 2. Standards for attacking a guilty plea on collateral review based on incorrect advice provided by trial counsel

A guilty plea will be upheld on collateral review if entered into voluntarily, intelligently, and knowingly. *Montoya v. Johnson*, 226 F.3d 399, 404 (5th Cir. 2000), *cert. denied*, 532 U.S. 1067 (2001). On the other hand, an "involuntary" plea is one induced by threats, misrepresentations, unfulfilled promises, or promises of an improper nature. *United States v. Hernandez*, 234 F.3d 252, 254 n.3. (5th Cir. 2000). A plea is "knowing" if the defendant understood the consequences of his plea, including the maximum possible punishment he faced if convicted. *Id.* The test for determining the validity of a guilty plea is whether the plea

represents a voluntary and intelligent choice among the alternative courses of action open to the defendant. *Hill v. Lockhart*, 474 U.S. 52, 56 (1985); *see United States v. Juarez*, 672 F.3d 381, 385-386 (5th Cir. 2012).

A plea induced by threats, improper promises, deception, or misrepresentation is not voluntary. *United States v. Amaya*, 111 F.3d 386, 389 (5th Cir. 1997). Nor is a plea voluntary if it is entered due to ineffective assistance of counsel.  *Hill*, 474 U.S. at 58-59.

To show ineffective assistance of counsel, a movant must show by a preponderance of the evidence that trial counsel's performance: (1) was deficient, and (2) prejudiced the defense. *Strickland v. Washington*, 466 U.S. 668, 687 (1984); *see also States v. Green*, 882 F.2d 999, 1002 (5th Cir. 1989). In the context of a guilty plea, "[P]rejudice occurs if 'there is a reasonable probability that, but for (trial) counsel's errors, [the defendant] would not have pleaded guilty and would have insisted on going to trial.'" *United States v. Smith*, 844 F.2d 203, 209 (5th Cir. 1988); *Hill v. Lockhart*, 474 U.S. at 59; *Mangum v. Hargett*, 67 F.3d 80, 84 (5th Cir. 1995).  And to determine the validity of a guilty plea, a court must determine "whether the plea represents a voluntary and intelligent choice among the alternative courses of action open to the defendant." *Hill*, 474 U.S. at 56. "The voluntariness of a plea is determined by 'considering all of the relevant circumstances surrounding it.'" *Fisher v. Wainwright*, 584 F.2d 691, 693 (5th Cir. 1978).  A trial attorney's ignorance of a point of law that is fundamental to his case combined with his failure to perform basic research on that point is a quintessential example of unreasonable performance under *Strickland*. *Hinton v. Alabama*, 134 S.Ct. 1081, 1089 (2014); *see Williams v. Taylor*, 529 U.S. 362, 395 (2000) (Deficient performance where trial counsel incorrectly    thought    that    state    law    barred    access    to    certain    records); *see    also*

*Kimmelman v. Morrison*, 477 U.S. 365, 385 (1986) (Deficient performance where trial counsel incorrectly believed that the State was obliged to take the initiative and turn over all of its inculpatory evidence to the defense.).

3. **Summary of: (1) trial counsel's incorrect advice to Movant, (2) trial counsel's failure to object to numerous instances of incorrect total loss and restitution, sophisticated means, number of alleged complaining witnesses, and amount of actual loss of each alleged complaining witness; and (3) the resulting prejudice to Movant.**

Under *Klein* and U.S.S.G. § 2B1.1 cmt. n.3(E)(1) (2013), PSR did not take into account the value received by each of the complaining witnesses prior to the discovery of the offense, and trial counsel's failure to object to these incorrect amounts of total loss and restitution harmed Movant. In fraud cases, when calculating loss amounts for the offense and relevant conduct under U.S.S.G. § 2B1.1, the offense level may be increased based upon the amount of the total loss.  U.S.S.G. § 2B1.1(b)(1) (2014).  However, the guidelines also require deduction of value provided to the complaining witness prior to the discovery of the offense.  U.S.S.G. § 2B1.1 cmt. n.3(E)(1).  Section 2B1.1, comment 3, provides:

"This application note applies to the determination of loss under subsection (b)(1).

(E)  Credits Against Loss.—Loss shall be reduced by the following:

(i) The money returned, and the fair market value of the property returned and the services rendered, by the defendant or other persons acting jointly with the defendant, to the complaining witness before the offense was detected. The time of detection of the offense is the earlier of (I) the time the offense was discovered by a complaining witness or government agency; or (II) the time the defendant knew or reasonably should have known that the offense was detected or about to be detected by a complaining witness or government agency.

14

In *United States v. Klein*, 543 F.3d 206 (5th Cir. Tex. 2008), the sentence and restitution order were vacated because by adopting the PSR with regards to the amount of loss, the district court abused its discretion due to the fact that the loss calculation was not offset by the value of the drugs dispensed as directed by U.S.S.G. § 2B1.1, cmt., application n. 3(E)(i). The Court held that the district court's failure to discount the actual loss by the value of the drugs dispensed resulted in an improper calculation under the guidelines. Specifically, in determining the total loss amount and amount of restitution owed by the defendant, the PSR did not take into account, and the judge did not consider, the value provided to the complaining witness, but instead considered only the amount of "gross proceeds." *Klein*, 543 F.3d at 213.  The defendant was convicted on numerous counts of healthcare and mail fraud resulting from false claims submitted for patients suffering from Hepatitis-C.  *Id.* at 208.  The basic treatment lasted 48 weeks, and consistent of three shots per week and a daily medication, "Ribavirin."  *Id.*  Patients visited the defendant's office each week, were evaluated, given a week's worth of Ribavirin, and a shot of Interferon.  *Id.*  Each patient was sent home with two additional preloaded syringes of Interferon for self-administration.  *Id.*  Instead of billing for one visit and the extra medication, however, the defendant billed every two days for an in-office visit and medication administration.  *Id.*  This resulted in three in-office visits per week, plus the medication, which was charged at a higher rate.  *Id.*

In determining loss amount, the government totaled the amount billed on any day where there were no "progress notes" in the file, meaning the patient had not been seen in-office.  *Id.* at 209.  This resulted in an increase to the offense level based on the total loss amount.  *Id.*  Restitution was also calculated using the total loss amount.  *Id.*  The government (and the PSR)

15

failed, however, to offset the total amount by the value of the medications that were self-administered by the patients on those days. *Id.*

The Fifth Circuit held as follows: first, a legally acceptable method must be used to calculate the loss. *Id.* at 214.  Second, "though [a] factual finding is entitled to deference, the amount of 'loss *shall* be reduced by . . . the fair market value of the . . . services rendered, by the defendant . . . to the complaining witness before the offense was detected'." *Id.*, quoting U.S.S.G. § 2B1.1 cmt. n.3(E)(1) (emphasis in original).  The failure of the PSR to take into consideration value received by the complaining witnesses resulted in an improper guidelines calculation. *Klein*, *id*. at 214.  As a result, the Fifth Circuit vacated the restitution order that is mandated under the Mandatory Victim's Restitution Act (MVRA). *Id.*  An order of restitution is reversible if it is probable that the court failed to consider a mandatory factor, and that failure influenced the court's decision. *Id.*  The MVRA states that "the court shall order restitution to each complaining witness in the full amount of each complaining witness's losses as determined by the court . . . ." *Id.*, citing 18 U.S.C. § 3663(f)(1)(A), emphasis in original.  The amount of the total loss was incorrect due to the lack of consideration given to the value provided by the defendant to the complaining witnesses. *Id.*  Thus, the district court abused its discretion because it failed to consider the value given by the defendant. *Id*. at 215.

Here, in the PSR, Movant was given a 16-level increase under § 2B1.1(b)(1) with a calculated loss at over $1,000,000, but less than $2,500,000. U.S.S.G. § 2B1.1(b)(1)(I); *see* ECF 16-1, p. 17.  This amount was calculated using only the full amount of investment from each franchisee involved.  ECF 16-1, pp. 7–16.  However, with only one exception, the PSR did not take into account the value received by each of the complaining witnesses prior to the discovery

of the offense. The single exception for Henry and Mason Crane was a $105,000 tenant buildout allowance paid to the Cranes as negotiated under the lease. ECF 16-1, p. 9.  Yet, trial counsel failed to object under U.S.S.G. § 2B1.1, cmt. n.3(E)(1).  This was **not** a strategic move because a reasonable attorney with an understanding of total loss calculations would have made such objections, and trial counsel's failure to do so harmed Movant. Thus, value was received by all the complaining witnesses prior to the discovery of the offense, and the sentencing guidelines required the value to be deducted from the total loss amounts prior to sentencing. Three areas will be addressed: construction and other costs of startup; buildout allowances provided for by the leases; and franchise fees and royalty payments.

### 4.   Construction and other costs of startup

As part of the franchise agreement, The Salad Bowl oversaw the construction of each of the franchise locations.  Each of the Franchisees paid, in advance of construction, an estimated amount to cover the costs of construction and startup.  Costs of construction and startup were then billed to The Salad Bowl (through Movant), and paid for by the same.

### i.   Yuri Gampel

Using the figures in the PSR, franchisee Gampel invested a total of $687,615.  ECF 16-1, pp. 7-8, 15, and 27.  No deductions were given for value provided to Gampel.  *See id.*  Gampel received not less than $232,574 in value in construction and buildout costs alone.  (App. 010–012, 029–113).   Gampel purchased five franchise locations, including 302 N. Canon Drive, Beverly Hills, and 1611 Haan Road, El Paso.  ECF 16-1, p. 7.

As part of the buildout of the Beverly Hills location, Movant hired an architectural firm, Milan, paying them $4,800 to complete the plans required under the lease. (App. 038).  Building

permits from the City of Beverly Hills were required, and Movant spent $7,339.56 on the permits. (App. 044-053). An additional $47,800 was paid to Numa Construction for the initial buildout of the location. (App. 040–043). Further, during the final months of construction, but after the purchase of the franchise by Gampel in June 2010, Movant paid $25,216.74 in rent. (App. 054–055). Movant already paid $8,405.58 per month beginning September 1, 2009 and during the time of construction. This amount, totaling $75,650.22, would be part of the costs of construction and therefore was value provided to Gampel. This additional rent amount was not figured into the total amount above. Similarly, other expenses, such as electricity, were paid throughout the period of construction beginning September 1, 2009. During the final months before opening, $1,833.99 was paid to Southern California Edison for utility expenses. (App. 082). Finally, during the final months of construction, and immediately prior to opening, Movant spent not less than $3,292.03 for travel expenses in building-out the location and training the staff for opening. (App. 069–079).

In completing the buildout of the restaurant, Movant purchased $4,133.56 worth of fixtures for the Beverly Hills location from Charlie's Fixtures. (App. 032–036). Additionally, for Beverly Hills, Movant purchased three refrigerators from Samsung Fixtures, totaling $10,818. (App. 037). Movant also purchased signage for the location totaling $5,113. (App. 039). Bar stools were purchased for $730.94. (App. 056-061). Other equipment totaling $265.54 was purchased from Star Restaurant Equipment, (App. 062–063), along with miscellaneous supplies for $923.38. (App. 080-081). Finally, Movant stocked Gampel's restaurant with a minimum of $3,023.26 in foodstuffs. (App. 064–068, 083). For the Fort Bliss location, see the buildout allowances section below.

18

### ii.  Alyson Corral

Using the figures in the PSR, franchisee Alyson Corral invested a total of $44,000.  ECF 16-1, pp. 9, 15, and 27.  No deductions were given for value provided to Corral. *See id.*  Corral received not less than $78,850.07 in value in construction and buildout costs alone, negating the entire loss amount.  (App. 010–012; 147–159, 178–179).  Corral purchased one Salad Bowl franchise in Fort Worth. ECF 16-1, p. 9.  Buildout costs—including construction, equipment, and small-wares—totaled not less than $70,875.  (App. 150–156).  This includes not less than $33,750 paid to K & K Contractors prior to October 12, 2010.  (App. 178–179).

Additionally, Movant paid at least $200 to the City of Fort Worth for construction plan review.  (App. 157–158).  And, Movant purchased point-of-sale equipment from T3 POS for $7,775.07.  (App. 147–149).  Thus, the value received by Corral totals not less than $78,850.07, which is $34,850.07 more than Movant received from Corral.  As no loss resulted to Corral, she should have been removed from the list of complaining witnesses.

### iii.  Leo Martinez

Using the figures in the PSR, franchisee Leo Martinez invested a total of $220,000.  ECF 16-1, pp. 8–9, 15, and 27.  No deductions were given for value provided to Martinez. *See id.* Martinez received not less than $95,795.84 in value for construction and buildout costs.  (App. 008–013; 160–170).  Martinez purchased one franchise location in Aurora, Colorado, for $170,000, exclusive of the franchise fee of $25,000. ECF 16-1, p. 8.  At the time that Martinez purchased the restaurant, Movant (as the Salad Bowl corporation) had already completed construction of the location and was fully functioning as a corporate restaurant.  ECF 16-1, p. 8. The $170,000 paid to Movant, was, therefore, in consideration of all of the expenses that had

gone into opening the restaurant—such as construction, equipment, small-wares, hardware, signage, etc.   A portion of these funds reimbursed Movant for construction costs totaling $84,974.77.  (App. 164–65).  Movant had also purchased small-wares for the location, including $1,123.61 worth from Sysco Corp.  (App. 169–170).   Further, Movant had purchased and installed, from T3 POS, the necessary point-of-sale system, at a cost of $9,697.46.  (App. 166–168).

### iv.  Eddie Chen

Using the figures in the PSR, franchisee Eddie Chen invested a total of $138,922.56, exclusive of the franchise fee.  ECF 16-1, p. 10, 15, and 27.  No deductions were given for value provided to Chen.  *See id.*   However, Chen received not less than $40,000 in value for construction and buildout costs.  (App. 180–181). Chen purchased one Salad Bowl franchise from Movant, to be built-out in the ice-rink area of the Galleria Mall in Dallas, Texas.  ECF 16-1, p. 10; (App. 171–177). As part of the necessary buildout of the rough location, Movant hired K & K Construction to perform the estimated $125,000 in construction work. (*See* App. 180–181).  Prior to October 12, 2010, Movant paid K & K Construction at least $40,000 on the Chen contract prior to October 12, 2010. (App. 180–181). As each of these expenditures were a necessary part of the construction costs, buildout, and startup of the restaurant purchased and opened by each of the above complaining witnesses, this is value received under the meaning of U.S.S.G. § 2B1.1 cmt. n.3(E)(1) and should not have been included in the loss amounts. Because trial counsel failed to object to the district court's not accounting for these amounts in the loss calculation, resulting in an incorrectly calculated loss, trial counsel was ineffective.

### 5.   Buildout Allowances

For Gampel, as part of the lease negotiation for the Fort Bliss location, Movant secured a tenant buildout allowance for Gampel in the amount of $117,888.50. (App. 084–146, specifically at 088. This was paid to Gampel upon his opening of the location and was not dependent on the use of the space as a Salad Bowl restaurant.  *Id.*

For Eddie Chen, as part of the lease negotiation for the Galleria location, Movant secured a tenant buildout allowance for Chen in the amount of $75,000. (App. 176 at ¶ 17).  This was paid to Chen upon his opening of the location and was not dependent on the use of the space as a Salad Bowl restaurant.  *Id.*

### 6.   Franchise Fees and Royalties

Franchise fees are standard in the industry and cover a myriad of intangible, yet valuable, items such as the use of the name and likeness of "The Salad Bowl:" name and logos; training manuals, construction in uniformity with all franchised restaurants; specification manuals; trademarked menus and menu development; trademarked recipes; on-site training; management training; helplines and corporate office assistance; the benefit of any national or local marketing done by the franchise; and numerous other items.  *See, e.g., TGI Friday's, Inc. v. Great Northwest Rests., Inc*., 652 F.Supp.2d 763 (N.D. Tex. 2009); *Bennigan's Franchising Co., L.P. v. Swigonski*, 2008 U.S. Dist. LEXIS 14871 (N.D. Tex., Feb. 26, 2008); *see also Understanding the Economics of Franchising and the Laws that Regulate It*, 26 Franchise L.J. 55 (2006).

Royalty Fees are paid on a percentage of the sales by each franchisee to the Franchisor. *TGI Friday's* and *Bennigan's*, *Id*. Royalty fees cover the continued use of the franchise's proprietary information, likeness, and marks.  *Id*. The amount of the initial franchise fee, as well

as the percentage to be paid as royalty fees, are determined by the franchise documents themselves.  The standard franchise fee a "The Salad Bowl" franchise was $25,000 per location.  *See* ECF 16.

As clearly stated in The Salad Bowl Franchise Agreement and Franchise Disclosure Document, the franchisee was entitle to, at a minimum: use "The Salad Bowl" name, logo, and likeness; garner assistance with site selection and lease negotiation, train both at the corporate headquarters and franchisee's location, as well as unlimited phone training; have access to the corporate chef, who could answer any questions pertaining to "The Salad Bowl" menu.  (App. 014; 182–342).  Additionally, the franchisee was provided copies of a: (1) "Manager Training Guide;" (2) "Employee Manual," in both English and Spanish; (3) complete "Nutritional Guide" providing detailed nutritional information on each food item found on "The Salad Bowl" menu; (4) "Marketing Manual," which contained finalized advertisements, logos, and other marketing materials. (App. 014, 182–342).  Franchisees also had full-time access to a "Franchisee Help Hotline," directly connecting the franchisee to the corporate office, and rotational access to a fully "wrapped" mobile advertisement, The Salad Bowl" mobile. (App. 182–342).  Franchisees also received corporate assistance with marketing and public relations within their local market, and corporate Salad Bowl employees were on hand for each restaurant opening. (App. 014, 182-342).

The franchise agreement, signed by each complaining witness, acknowledges the requirement of a franchise fee, the rights that are provided via the payment of the franchise fee, and the clear agreement that such fees are nonrefundable, unless permitted through other agreement:

22

> 1.3 Initial Franchise Fee: In consideration of the franchise granted herein, Franchisee shall pay to Franchisor, upon execution of this Agreement, a franchise fee of Twenty-Five Thousand Dollars ($25,000) ("Franchise Fee"). The Franchise Fee shall be deemed fully earned upon execution of this Agreement as consideration for expenses incurred by Franchisor in furnishing assistance and services to Franchisee and for Franchisor's lost or deferred opportunity to franchise others and shall be non-refundable, except as may be otherwise specifically provided in this Agreement.

(App. 240).  As contemplated by the agreement, the franchise fee was fully earned, upon signing, unless for a valid reason excusing performance, and specifically delineated within the agreement, the Franchisee was unable to meet the agreed terms.  (App. 014, 240).  However, even if the Court were to find the terms of the agreement inoperable, it should be readily apparent that once a restaurant is open and operating, the franchise fee has been fully earned.

### i.   Yuri Gampel

The Beverly Hills restaurant was fully constructed, opened and operated by Gampel, who received the value and benefits of the marketing, training, expertise, and business development provided by Movant as the franchisor.   Thus, this franchise fee was fully earned.

Movant had the exclusive lease to the Fort Bliss restaurant, which had value all of its own due to the restrictiveness of the army base to outside vendors.  (App. 012).  Further, Movant personally guaranteed Gampel's lease, as the landlord would not approve Gampel without such guarantee.  (App. 124–127).  This allowed Gampel to open a restaurant on the base even if it was not a "The Salad Bowl" restaurant.  (App. 012).  This benefit, in addition to the tenant buildout allowance provided for *infra*, was possible only through the payment of the franchise fee.  (App. 012).  The $25,000 franchise fee paid for the Fort Bliss location should not have been figured in the loss amount.

### ii.  Alyson Corral

The Fort Worth location was constructed, opened, and operated by Corral. (App. 012). Corral received the full benefit of the franchise fee under the agreement and as commonly understood in the industry.  (App. 012).  The $25,000 franchise fee should not have been figured in the loss amount.

### iii.  Leo Martinez

Martinez paid a $25,000 franchise fee for the Aurora location and paid an additional $25,000 for a "right of refusal" option on a location on Fort Bliss.  ECF 16-1, p. 8; (App. 343). Aurora was fully constructed, opened and operated by Movant and purchased by Martinez, who received the value and benefits of the marketing, training, expertise, and business development provided by Movant as the Franchisor.  The franchise fee was fully earned and should not have been included in the loss amount. In the Franchise Agreement, dated February 12, 2010, and fully executed by all parties, Martinez agreed that the $25,000 franchise fee was fully earned upon his signing of the agreement.  (App. 353–424, at 360). On June 14, 2010, when the opportunity for the location on the Fort Bliss base became a reality, Martinez declined to exercise his option and requested the return of the paid fee.  (App. 013, 344).  Movant returned the $25,000 advance fee in full via cashier's check. (App. 013, 344).  The receipt of this cashier's check was acknowledged by Martinez in writing.  (App. 346).  This amount should not have been included in the loss calculation.

### iv.  Eddie Chen

The Galleria restaurant was fully constructed, opened and operated by Chen, who received the value and benefits of the marketing, training, expertise, and business development

provided by Movant as the Franchisor.  (App. 013). The franchise fee was fully earned and should have been deducted from the loss amount.

### v.  Henry and Mason Crane

Henry and Mason Crane invested $172,672.56.  ECF 16-1, pp. 8–9, 15, and 27.  A single deduction was given for value provided through the $105,000 tenant buildout allowance provided for in the lease.  *See id.*  This results in the loss amount in the PSR, and adopted by the Court, at $67,672.56.  *Id.* The Arizona restaurant was fully constructed, opened and operated by the Cranes, who received the value and benefits of the marketing, training, expertise, and business development provided by Movant as the Franchisor.  (App. 013). The franchise fee was fully earned and should have been deducted from the loss amount.

### vi.  Juan Ledesma

Using the figures in the PSR, Juan Ledesma invested a total of $13,400.  ECF 16-1, p. 12, 15, and 27.  No deductions were given for value provided to Ledesma. *See id.*  Ledesma had worked for the Corporate restaurant and was aware of any issues that existed. ECF 16-1, p. 12; (App. 014).  Ledesma's primary reason for purchasing the restaurant in Roanoke, Texas, was to have access to the back half of the property for its already existing catering business. ECF 44, p. 25; (App. 014).  Under the contract, Ledesma would receive the fully-finished restaurant, and the catering company in the back of the property in return for payment of $31,400, which included a $25,000 franchise fee.  ECF 44, p. 25–26.  Instead, Ledesma received a catering business and a "The Salad Bowl" restaurant—both of which are still in operation today—for $13,400, and yet he claimed fraud.  *See* ECF 44, p. 25; (App. 014).  The amount paid is not only earned under the franchise fee, but for the value of all other items included in the gaining of a fully operational set

of businesses.  (App. 014).

### vii. Tina Nguyen

Using the figures in the PSR, Nguyen invested $25,000.  ECF 16-1, p. 15 and 27.  No deductions were given for value provided to the Franchisee.  *See id.*  On July 9, 2010, The Salad Bowl (through Movant) and Nguyen executed a "Mutual Termination Agreement" and Nguyen's $25,000 franchise fee was refunded. (App. 347–350).   The $25,000 investment by Nguyen should have been fully deducted from the loss calculations.  No loss resulted to Nguyen, so she should have been removed from the list complaining witnesses.

### viii.    Bertrand Brown

Using the figures in the PSR, Brown invested $25,000.  ECF 16-1, p. 15 and 27.  No deductions were given for value provided to the Franchisee.  *See id.*  On August 20, 2010, The Salad Bowl (through Movant) and Brown executed a "Mutual Termination Agreement" and Brown's $25,000 franchise fee was refunded.  (App. 351–352). The $25,000 investment by Brown should have been fully deducted from the loss calculations.  No loss resulted to Brown, so she should have been removed from the list complaining witnesses.

7. **Had Movant received effective trial counsel, the total actual loss would have been not more than $819,018, and the total number of complaining witnesses would have been no more than eight.**

Taking into consideration each of the proper deductions provided *infra*, the loss amount, restitution amount, and number of complaining witnesses would have been significantly different, impacting the sentence on Movant. The evidence presented in the Appendix shows that Movant did not agreed with trial counsel to be held liable for the relevant conduct amounts that trial counsel failed to properly object to.  And trial counsel properly objected or opted to take the

26

issue to trial, the total actual loss amount would have not more than $819,018, which is less than

$1,000.000.  And, the total number of alleged victims would have been eight (see App. 029-031):

| | |
|---|---|
| Alyson Corral | 0 |
| Eddie Chen: | $100,000 |
| Joseph Leszko | $21,000 |
| Leo Martinez | $74,204 |
| Ray Woolston | $100,000 |
| Anjum Farooqi | $25,000 |
| Henry and Mason Crane | $42,673 |
| Juan Ledesma | $0 |
| Kroll, Meir and Blaugrand | $51,100 |
| Yuri Gampel | $405,041 |

**TOTAL LOSS AMOUNT – not more than $819,018**

> **8. Movant's guilty plea was involuntary or uninformed because he received incorrect advice from trial counsel on the issue of whether when determining Movant's sentence, the court would consider uncharged relevant conduct, with the ineffective assistance of trial counsel occurring because trial counsel failed to object to numerous instances of incorrect restitution, sophisticated means, number of alleged complaining witnesses, and amount of the actual loss of each alleged complaining witness**

The clearest evidence of the constitutionally defective counsel is the chart provided to

Movant by trial counsel in which trial counsel argued to Movant that under the sentencing

guidelines, the Government's calculation of level 28 was incorrect. (App. 017).  Trial counsel

told Movant in the chart that Movant faced 6 levels for wire fraud, 16 levels for the loss amount,

plus 2 levels for "sophisticated means," minus 3 levels for "acceptance of responsibility."  (App.

003, 017). The chart provided by trial counsel shows a level 21, which trial counsel explained to

amount to a sentence of 37-46 months.  (App. 003, 017).  And before the PSR was released and

Movant's guilty plea, trial counsel told Movant that: (1) probation was a possibility; and (2)

Movant may face up to 36 months in prison. (App. 003).  And after the PSR was released, trial

27

counsel told Movant that he faced 37-46 months for certain.  (App. 003).  But prior to pleading

guilty, Movant does not recall trial counsel telling him that he would face more than 36 months

in prison.

Movant's claims are corroborated by emails between him and trial counsel.   On

September 11, 2013, trial counsel explained to Movant as follows:

> "This means if the government proves that Gampel and Benavides were
> fraudulently induced to give you the amount of money they "invested," that puts
> this case well into the "1 million to 2.5 million" sentencing level. The FBI agent
> told me he will not be able to prove over 2.5 million, but believes he can prove
> over 1 million. With that being said, with three level credit for "acceptance of
> responsibility, that puts this case at a "37-46 months" range for that dollar loss
> amount. The government is alleging that you used "sophisticated means" (+2
> levels) and you fraudulently disseminated Benavides' personal information to
> facilitate the alleged schedule (+2 levels). Therefore, the government puts you at a
> Level 25, which is "57-71 months." Without solid contradicting evidence from
> you regarding these loss amounts, I believe our best defense is to not dispute that
> the alleged loss amount is between 1 million and 2.5 million, but continue to
> dispute and OBJECT TO the "sophisticated means" and that you fraudulently
> disseminated Benavides' personal information. That will remove the additional 4
> levels and get this case to a level 21, which is "37-46 months" on the  guidelines."

Movant was reasonable to understand this advice to mean that if he did not object to the

relevant conduct amounts but instead object only to the "sophisticated means," Movant would be

at a level 21 as trial counsel's chart clearly shows. (App. 003-004, 017-020).  Trial counsel also

made clear that Movant would be at a level 21, which is 37-46 months in prison. This advice was

consistent with how trial counsel advised Movant before Movant pleaded guilty and received the

PSR, during which time Movant recalls being advised by trial counsel that he would receive no

more than about three years in prison. This was incorrect advice. Trial counsel also advised

Movant as follows:

> If we object TO ALL alleged relevant conduct in excess of the $100,000 paid by Eddie Chen as we discussed this week, and the government is successful in proving the alleged conduct to be between 1 million and 2.5 million, we risk losing the 3 level "acceptance of responsibility" departure on the guidelines. That will put the case between a Level 24 (51-63 months) without the 4 levels for sophisticated means and fraudulent use of Benavides personal information if the Court does not agree with the Government, TO Level 28 (78-97 months) if the Judge does agree with the Government on those 4 levels. Therefore, that is the risk of disputing/objecting all the alleged "relevant conduct."

(App. 004, 018-020).  Movant reasonably understood this advice to mean that if trial counsel objected to relevant conduct other than the $100,000 paid by Eddie Chen, Movant would lose the 3-level acceptance of responsibility departure from the guidelines, and the case would be at a level 24 with 51-63 months of exposure, and possibly up to level 28 with 78-97 months of exposure. This also was incorrect advice because prior to pleading guilty, Movant agreed with trial counsel for responsibility of the $100,000 that Chen tendered.  This is specifically how trial counsel objected, as Movant never knowingly agreed to the relevant conduct or amounts beyond the $100,000 that Chen tendered.

Trial counsel also advised Movant as follows:

> As your lawyer, I will obviously do whatever you instruct me to do. My best advice at this point WITHOUT further written or substantial evidence from you to contradict the government's position on loss is to not object to the loss amount of being between 1 million and 2.5 million BUT continue TO object to the 4 added levels for the alleged "sophisticated means" and the alleged "unauthorized public dissemination of Benavides' personal information." If the Judge agrees with us, then the sentencing guidelines put this at a Level 21 (37-46 months).

(App. 005, 018-020).  Movant reasonably understood this advice to mean that if trial counsel did not object to the loss being between $1 million and $2.5 million, but instead objected only to the

29

"sophisticated means" and the "unauthorized public dissemination of Benavides' personal information," Movant's offense level would be 21, which would be 37-46 months in prison. This also was incorrect advice.

Then in a series of emails between Movant and trial counsel, the first of which was sent on September 12, 2013 at 5:30 p.m., trial counsel states to Movant:

> "37 months under the current information available IS a win for you in this case in our current situation. 9 years in federal prison is a much different situation. When we discussed probation in the very beginning of this case months ago, you told me that the government would not be able to prove beyond the $100,000 you pleaded guilty to in April. The facts have substantially changed since then. Probation is very unlikely under the current fact situation, as we have discussed."

(App. 005-006, 022-024). However, prior to pleading guilty, Movant told trial counsel that he was willing to plead guilty to the $100,000 as to Chen, and they never discussed the relevant conduct issue as it legally existed.

Further, trial counsel had all of the information and discovery before Movant pleaded guilty.  The information attached to the Appendix is not "newly discovered" evidence.  It was obtained from trial counsel's file.

As this court knows, under Movant was sentenced to 70 months in prison and was ordered to pay restitution in the amount of $1,437,040.12. (App. 425-431). This is based on a Total Offense Level of 26 and a Criminal History Category of I, which provides a guideline range of 63 to 78 months. ECF 16-1, p. 24.

As a result, Movant was clearly improperly advised as to the implications of pleading guilty. Thus, Movant has shown deficient performance under *Strickland*. *See Strickland*, 466 U.S. at 687; U.S. Const. Amend. VI.  Further, Movant has shown that he was harmed by trial

counsel's ineffective performance and improper advice.  Prejudice occurred because "...there is a reasonable probability that, but for (trial) counsel's errors, [the defendant] would not have pleaded guilty and would have insisted on going to trial.'" *Smith*, 844 F.2d at 209; *Hill*, 474 U.S. at 59. Movant's plea was not a "voluntary and intelligent choice among the alternative courses of action open to Movant." *Hill*, 474 U.S. at 56. And when considering all of the relevant circumstances surrounding the voluntariness of Movant's plea, it is clear that due to constitutionally defective advice, Movant did not voluntarily plead guilty. *See Fisher*, 584 F.2d at 693.

## VII.  Conclusion and Prayer

Based on the arguments and facts in the motion and this brief, Movant respectfully requests that: (1) the relief requested in this motion be granted, (2) the Court find that Movant's guilty plea was involuntary or uninformed because he received incorrect advice from trial counsel (ineffective assistance of counsel) on the issue of whether when determining Movant's sentence, the court would consider uncharged relevant conduct, with the ineffective assistance of trial counsel occurring because trial counsel failed to object to numerous instances of incorrect restitution, sophisticated means, number of alleged complaining witnesses, and amount of the actual loss of each alleged complaining witness; (3) the *Judgment in a Criminal Case* (App. 425-431) be overturned, (4) his sentence be set aside, (5) he be resentenced per the sentencing guidelines based on the arguments contained in this brief, and (6) he be immediately released from confinement and constraint.

Respectfully submitted,

Kristin R. Brown
18208 Preston Road
Dallas, TX 75252
Phone: 214-446-3909
Fax: 214-481-4868
kbrown@idefenddfw.com
Texas Bar No. 24081458
Attorney for Movant


**/s/ Kristin Brown**
By: Kristin Brown


Michael Mowla
P.O. Box 868
Cedar Hill, TX 75106
Phone: 972-795-2401
Fax: 972-692-6636
michael@mowlalaw.com
Texas Bar No. 24048680
Attorney for Movant


**/s/ Michael Mowla**
By: Michael Mowla


## VIII. Certificate of Service

I certify that on November 29, 2015, a true and correct copy of this document was served upon all parties of record via the ECF filing system. In addition, this Brief (without the appendix) was sent separately to Tim Funnell of the United States Attorney's Office via email to Tim.Funnell@usdoj.gov, with a message to Mr. Funnell that I will make the entire appendix available to Mr. Funnell upon demand.

**/s/ Michael Mowla**
By: Michael Mowla