## UNSWORN DECLARATION UNDER PENALTIES OF PERJURY

I, Michael Carroll, declare under penalties of perjury that the foregoing information and allegations of this Declaration are true and correct:

1.    I have personal knowledge of the facts stated in this declaration.

2.    I have not been compelled or threatened to sign this declaration in any manner.

3.    I am signing this declaration knowingly, voluntarily, and freely.

4.    On March 17, 2014, in cause number 3-13-CR-00076, I was sentenced to 70 months in prison for one count of wire fraud.

5.    I was also ordered to pay restitution in the amount of $1,437,040.12.

6.    On March 4, 2013, I pleaded guilty to the one count of wire fraud.

7.    On June 10, 2013, the PSR was released.

8.    I was represented by Mr. Peter Schulte during my trial court proceedings.

9.    Prior to hiring Mr. Schulte, he told me in his office that he had significant experience in federal criminal cases.

10.    However, after I was sentenced, my research shows that Mr. Schulte did not officially represent anybody in a federal criminal case in Texas. If Mr. Schulte did officially represent someone in a federal criminal case in Texas, I could not find any evidence of it.

11.    I never discussed anything about "relevant conduct" with Mr. Schulte until I received my PSR.

12.    Prior to receiving my PSR, Mr. Schulte never warned me about the possibility of being held responsible for relevant conduct as far as the possibility existing of receiving additional months in prison because of relevant conduct.

13.    In my Plea Agreement that I signed on March 4, 2013, on page 2, there is a section that states "The maximum penalties the Court can impose include restitution to victim or to the community, which may be mandatory under the law, and which Carroll agrees may include restitution arising from all relevant conduct, not limited to that arising from the offense of conviction alone." Mr. Schulte did not explain to me what this means. This section of the Plea Agreement certainly does not tell me that I could receive additional months in prison because of relevant conduct. I took to mean at most that I may face additional restitution, not additional time in prison. Mr. Schulte did not explain to me before I pleaded guilty that I may face additional time in prison because the restitution may take me to a different level altogether.

1

**001**

14.    On April 4, 2013, I pleaded guilty in front of the magistrate judge. During this hearing, the prosecutor read into the record the following: "Restitution to the victim or to the community which may be mandatory under the law and which Carroll agrees may include restitution arising from all relevant conduct, not limited to that arising from the offense of conviction alone." Mr. Schulte did not explain to me what this means. Also, what was read into the record does not tell me that I could receive additional months in prison because of relevant conduct. I took also to mean at most that I may face additional restitution, not additional time in prison. Mr. Schulte did not explain to me before I pleaded guilty that I may face additional time in prison because the restitution may take me to a different level altogether.

15.    On June 10, 2013, the PSR was released, and I was shocked to see that the government was going to hit me with the "relevant conduct" as though I had pleaded to all of the loss amounts.

16.    I was found by the PSR to be accountable for a total loss of $2,446,002.89. I learned after the PSR was released that because § 2B1.1(b)(1)(I) of the sentencing guidelines says that if the total loss is more than $1,000,000 but less than $2,500,000, 16 levels are added.

17.    When the PSR came out I received an email from Mr. Schulte saying to call him immediately. He told me to sit down because they wanted me for "up to 20 years." I was shocked.

18.    I never agreed with Mr. Schulte that I was responsible for a total loss of more than $1,000,000.

19.    In fact, prior to pleading guilty to the one count, I agreed with Mr. Schulte that I would be responsible for the $100,000 that Eddie Chen tendered for his franchise.

20.    This is in fact exactly how Mr. Schulte objected on my behalf, that I do not agree to any of the relevant conduct beyond the $100,000 that Eddie Chen tendered for his franchise.

21.    Although the PSR showed that restitution should be $2,362,742.89, Judge Godbey found that the loss for Benavides (alleged to have been $919,032.77) was shown to be "more likely than not." Judge Godbey overruled the other objections to the PSR.

22.    My sentencing range ended up being 63 to 78 months at level 26, and Judge Godbey sentence me to 70 months.

23.    Prior to pleading guilty, I had numerous conversations with Mr. Schulte about my possible exposure as far as months in prison is concerned. Mr. Schulte told

me several times that probation is a possibility, and that if I do not receive probation, I would face at most about three years (36 months) in prison.

24.     Attached to this declaration is a chart (Exhibit 1) provided to me by Mr. Schulte in which he specifically showed me that under the sentencing guidelines, the government's calculation of a level 28 was incorrect.  Exhibit 1 is the actual chart provided to me by Mr. Schulte.

25.     Mr. Schulte told me and showed me in the chart attached as Exhibit 1 that I was looking at 6 levels for the single count of wire fraud, plus 16 levels for the loss amount, plus 2 levels for "sophisticated means," minus 3 levels for "acceptance of responsibility."

26.     As Exhibit 1 also shows, Mr. Schulte told me that I would be at level 21.

27.     At a level 21, Mr. Schulte told me I would face 37-46 months.

28.     Before the PSR was released and before I pleaded guilty, Mr. Schulte told me that probation was a possibility.

29.     Before the PSR was released and before I pleaded guilty, I recall Mr. Schulte telling me that I may face up to three years (36 months) in prison.

30.     After the PSR was released, Mr. Schulte began telling me that I was facing 37-46 months for sure.

31.     However, at no time prior to pleading guilty do I recall Mr. Schulte telling me that I would face more than three years (36 months) in prison

32.     After I pleaded guilty and received the PSR, I had numerous conversations and communications Mr. Schulte about the range of the time I may face in prison.

33.     Some of the email communications are attached to this declaration as Exhibits 2, 3, and 4.  These are true and correct copies of the emails between me and Mr. Schulte.

34.     Again, my complaint is that before pleading guilty and receiving the PSR, Mr. Schulte did not explain to me what "relevant conduct" meant.

35.     In an email dated September 11, 2013 at 6:44 p.m. (See Exhibit 2), Mr. Schulte was including the loss amount alleged by Benavides of $919,032.77.  Mr. Schulte specifically said to me as follows:

> **"This means if the government proves that Gampel and Benavides were fraudulently induced to give you the amount of money they "invested," that puts this case well into the "1 million to 2.5 million" sentencing level. The FBI agent told me he will not be able to prove over 2.5 million, but believes he can prove over 1 million. With that**

**003**

> being said, with three level credit for "acceptance of responsibility, that puts this case at a "37-46 months" range for that dollar loss amount. The government is alleging that you used "sophisticated means" (+2 levels) and you fraudulently disseminated Benavides' personal information to facilitate the alleged schedule (+2 levels). Therefore, the government puts you at a Level 25, which is "57-71 months." Without solid contradicting evidence from you regarding these loss amounts, I believe our best defense is to not dispute that the alleged loss amount is between 1 million and 2.5 million, but continue to dispute and OBJECT TO the "sophisticated means" and that you fraudulently disseminated Benavides' personal information. That will remove the additional 4 levels and get this case to a level 21, which is "37-46 months" on the guidelines."

36. I understood this to mean that if I do not object to the relevant conduct amounts but instead object only to the "sophisticated means," I would be at a level 21.

37. This turned out to be incorrect advice.

38. And again, in the email Exhibit 2, Mr. Schulte told me that I would be at a level 21, which is 37-46 months in prison. This was consistent with what he told me before I pleaded guilty and before I received the PSR, during which time I recall that told me that I would receive no more than about 3 years in prison.

39. In the same email Exhibit 2, Mr. Schulte told me the following:

> If we object TO ALL alleged relevant conduct in excess of the $100,000 paid by Eddie Chen as we discussed this week, and the government is successful in proving the alleged conduct to be between 1 million and 2.5 million, we risk losing the 3 level "acceptance of responsibility" departure on the guidelines. That will put the case between a Level 24 (51-63 months) without the 4 levels for sophisticated means and fraudulent use of Benavides personal information if the Court does not agree with the Government, TO Level 28 (78-97 months) if the Judge does agree with the Government on those 4 levels. Therefore, that is the risk of disputing/objecting all the alleged "relevant conduct."

40. I understood this to mean that if he objected to relevant conduct other than the $100,000 paid by Eddie Chen, I would lose the 3-level acceptance of responsibility departure from the guidelines, and the case would be at a level 24 with 51-63 months of exposure, and possibly up to level 28 with 78-97 months of exposure.

41. This turned out to be incorrect advice from Mr. Schulte because prior to pleading guilty to the one count, I agreed with Mr. Schulte that I would be responsible

**004**

for the $100,000 that Chen tendered for his franchise, and this is how Mr. Schulte objected on my behalf, which is that I do not agree to any of the relevant conduct or amounts beyond the $100,000 that Chen tendered for his franchise. As this court knows, I received a 3-level downward departure for acceptance of responsibility despite the fact that I objected to all the relevant conduct.

42.     Then in the summary of the email Exhibit 2, Mr. Schulte told me this:

**As your lawyer, I will obviously do whatever you instruct me to do. My best advice at this point WITHOUT further written or substantial evidence from you to contradict the government's position on loss is to not object to the loss amount of being between 1 million and 2.5 million BUT continue TO object to the 4 added levels for the alleged "sophisticated means" and the alleged "unauthorized public dissemination of Benavides' personal information." If the Judge agrees with us, then the sentencing guidelines put this at a Level 21 (37-46 months).**

43.     I understood this to mean that if Mr. Schulte did not object to the loss being between $1 million and $2.5 million, but instead just objected to the "sophisticated means" and the "unauthorized public dissemination of Benavides' personal information," my offense level would be 21, which would be 37-46 months. But this turned out to also be incorrect advice.

44.     Then in a series of emails that are attached as Exhibit 3, the first of which was sent on September 12, 2013 at 5:30 p.m., I made it clear to Mr. Schulte that I was confused and I needed the issues regarding the offense levels explained to me. Earlier that day at 3:44 p.m., I explained to Mr. Schulte that I did not understand this process and I did not understand why he had told me that I was facing 9 years.

45.     This was in response to an email Mr. Schulte sent to me in which he states:

**"37 months under the current information available IS a win for you in this case in our current situation. 9 years in federal prison is a much different situation. When we discussed probation in the very beginning of this case months ago, you told me that the government would not be able to prove beyond the $100,000 you pleaded guilty to in April. The facts have substantially changed since then. Probation is very unlikely under the current fact situation, as we have discussed."**

46.     However, what I recall telling Mr. Schulte before I pleaded guilty is that the only offense I am willing to plead guilty to is the $100,000 as it applied to Chen, and again, we **never** discussed the relevant conduct issue and Mr. Schulte never explained this issue to me.

**005**

47. Most importantly here, Mr. Schulte had all of the information and discovery before I pleaded guilty. I do not recall Mr. Schulte ever explaining to me that the relevant conduct as to any of the other franchisees and their alleged losses could cause me to have a sentence of 70 months in prison.

48. As I explain above, the section in my Plea Agreement that I signed on March 4, 2013, page 2, that discusses "restitution arising from all relevant conduct, not limited to that arising from the offense of conviction alone" I took to mean at most that I may face additional restitution, not additional time in prison. Mr. Schulte did not explain to me what this means. And, this language does not tell me that I could receive additional months in prison because of relevant conduct. Mr. Schulte did not explain to me before I pleaded guilty that I may face additional time in prison because the restitution may take me to a different level altogether.

49. As I also explained above, when I pleaded guilty before the magistrate judge on April 4, 2013, and the prosecutor read into the record the following: "Restitution to the victim or to the community which may be mandatory under the law and which Carroll agrees may include restitution arising from all relevant conduct, not limited to that arising from the offense of conviction alone," like the language in the plea agreement, I also took to mean at most that I may face additional restitution, not additional time in prison. Mr. Schulte did not explain to me what this means. And, this language does not tell me that I could receive additional months in prison because of relevant conduct. Mr. Schulte did not explain to me before I pleaded guilty that I may face additional time in prison because the restitution may take me to a different level altogether.

50. In the email dated September 12, 2013 at 2:26 p.m., I made all of this clear again to Mr. Schulte when I told him that "I do not believe I was shared and explained this relevant conduct clause as I am screwed even with my plea."

51. Then in the email attached as Exhibit 4, dated September 12, 2013 at 5:48 p.m.. Mr. Schulte told me that "If you would like to withdraw your plea, please let me know in writing and I will file the motion. I have a strong feeling David Jarvis will not object to such a request, although I have not broached the subject with him."

52. After Mr. Schulte's representation terminated, I learned that I did not qualify to withdraw my plea, and it was highly unlikely that Mr. Jarvis would agree to such a request.

53. Mr. Schulte's representations to me after receiving the PSR about being at level 21 with 37-46 months of exposure was consistent throughout the proceedings all the way up to the sentencing on March 17, 2014.

54. Mr. Schulte's representations to me about being at level 21 with 37-46 months of exposure were consistent with what he told me before I pleaded guilty,

when Mr. Schulte told me several times that probation is a possibility, and that if I do not receive probation, I would face at most about three years (36 months) in prison.

55.     Even leading up to the Friday before sentencing on March 17, 2014, Mr. Schulte continued to tell me that I would be at level 21 and receive 37-46 months in prison.

56.     I told Mr. Schulte that we did not start the idea of franchising until we saw success with our own store and saw that other people were interested.

57.     And I told Mr. Schulte numerous things about allegations in the PSR that were simply wrong and showed him the paperwork.  For instance, the information provided in paragraph 16 of the PSR runs contrary to what the actual franchisees signed. The franchise agreements allowed me to charge a franchise fee. Once a person pays this fee, they become franchisees, not typical investors.  This allows the franchisees to obtain training not just by Mark Gangler, but also by our staff that helped set up the stores. All royalties were paid to the corporation and never to me personally. This is exactly how Subway, Pizza Hut, and other companies that have franchisees do it.  Franchise royalties is how franchise companies grow. And, a franchisee does not have the right to inspect the books of our company. Nowhere in the franchise agreement that franchisees signed does it say this.

58.     I also explained to Mr. Schulte that the information in paragraph 17 of the PSR was incorrect.  I did not provide information regarding franchise locations. All franchisees and possible franchisees were free to contact each other and ask whatever questions they wanted.  Each of the franchisees and potential franchisees were allowed to conduct their own due diligence as to financials and the system with each other. We provided all the information for the franchisees to discuss the system without us. We also encouraged the franchisees and potential franchisees to sit in our own stores and count customers, and many did.  We had lots of promotions going on during this time. We did a Groupon sale, which brought in over 400 people on a day that potential franchisees came in to observe. We told our managers to run specials on various days. It is not illegal to run specials. We never had families sitting at any particular store for hours just to make them look busy.  The franchise agreement even provides that the franchisees are not relying on any financial information given to them by the company, but are free to conduct their own due diligence. Finally, the Las Colinas restaurant was our flagship.

59.     I also explained to Mr. Schulte that paragraph 18 of the PSR was incorrect.  I did not advise franchisees that the company would place their money into escrow. This is something that came up with a few franchisees who were paid back from an escrow account. We did not advise franchisees that signed up we would put money into escrow as our franchise agreement, that once again they all signed stated we did not have to place this money in escrow.  Franchise fees are what a franchise

company uses to build itself up. Franchise fees are used to pay payroll, and pay rent in the corporate offices.

60.   I also explained to Mr. Schulte that paragraph 19 of the PSR was incorrect.   We did have leased equipment for corporate stores that then became franchise locations, but those stores did not begin as franchise locations.   We are talking about less than $7,000 worth of refrigeration equipment, and I explained to Mr. Schulte that this could not have formed the basis of any intend on my part to defraud franchisees. Franchisees had to sign for their own leases on the ice machines. It stated in the franchise agreement that the ice machine was a leased item. And, companies that owned some of the equipment did not threaten to repossess the equipment until the whole company went bankrupt. When the stores were open and operating, the company paid the leases as it received the payments from the franchisees.

61.   I also explained to Mr. Schulte that paragraph 21 of the PSR had several incorrect representations.   Mark Gangler was originally hired as a manager to the first store. Gangler then went to another restaurant that I had owned, Collinsville Cafe, which was unrelated with Salad Bowl. When we opened the first store, we received all of our mail at the restaurant. When we started the franchising, we started receiving mail at the restaurant but did not want employees to be able to open checks and look at other information. While we were looking for offices, we used my house as an office for a short period of time, holding staff meetings there.  People worked at my home.  I did not want mail going to my house so opened up a PO Box in the company's name. Once we obtained regular offices, our receptionist had the keys and would get the mail. Thus, the comment about Gangler or anybody else in fact not having keys is not true. Even our minimum wage employee had keys.

62.   And, as I explained to Mr. Schulte, paragraph 21 of the PSR is correct that we did have several bank accounts, but we did so for a good reason. We started with Laredo National Bank, which turned to BBVA Compass. Then we moved to Chase as they were closer to more of our locations. Then when we moved to California, we went to Bank of America as they were close to all the locations. We had operating accounts, construction accounts, payroll accounts, and savings accounts.   We did not have numerous bank accounts because we were trying to defraud anybody.

63.   I explained to Mr. Schulte that paragraph 22 of the PSR was incorrect because we never said that we would hold construction funds in an escrow account. How can we hold funds needed for construction in an account that would be escrowed?

64.   And in paragraph 22 of the PSR, I explained to Mr. Schulte that as to Yuri Gampel, we started construction and we paid for the construction. We gave them the stores and allowed them to collect the funds and the receipts. Paragraph 22 makes it seem like I approached Gampel. That is not correct. Gampel approached me because he wanted to start the business. Gampel explained to me that he had enough money to

8                                                                    008

franchise the "entire United States." Gampel took receipts, opened stores, took over the Las Colinas store at one point, operated the Beverly Hills store at its opening, and started construction on three other units that opened. If these units were not performing, Gampel would not have continued opening continue more units.

65.     I explained to Mr. Schulte the following about paragraph 23 of the PSR: Leo Martinez purchased two locations in Colorado, and had a first right of refusal for the El Paso location. Once we had someone who was interested in the Fort Bliss location, we approached Martinez about the person. He declined the option, and so his option money in the amount of $25,000 was returned to him (it was returned as a cashier's check as our first right of refusal stipulated). I explained to Mr. Schulte that we do not owe him $244,000.

66.     Further, if we did not pay employees, why did they continue to work? If franchisees were told that I owed taxes related to the stores, why did they pay royalties? Why did they continue to have us train their employees? Why did they wait over three years before they complained about anything?

67.     I explained to Mr. Schulte that as to paragraph 24 of the PSR and the store in Albuquerque, New Mexico, the Cranes received the $105,000 back for the tenant reimbursement. They also could not get approved for the lease alone, so I personally guaranteed the lease. Still, their franchise was on the brink of termination before any of these events happened. They were not following the ordering guidelines, the labor process, and the model to advertise. The food cost was twice the amount shown to them. Benavides attended the opening with us. We sent over two dozen employees to train them, and the company paid for it.  Once the Cranes failed to follow the rules, we sent them a termination letter.

68.     I explained to Mr. Schulte that Stacy Blaugrund was not truthful on several issues. Meir Kroll wired 12,500 to me based because Kroll wanted to be an investor in the Beverly Hills store. I did not ask for $75,000. We discussed the costs of building a store. Stacey Blaugrund had met Gampel, and it was her father who during a vacation had said, "sell the store." Meir Kroll, Stacy Blaugrund, and myself agreed to sell the store to Gampel.  Blaugrund met Gampel, shook his hand, and they spoke about Blaugrund finding new locations for Gampel. Blaugrund acts as though she had no idea who Gampel was. In fact, they were introduced at the grand opening of the store.  Blaugrund knew the contractor of the store personally, who met with all of us throughout the entire process. How Blaugrund can claim that she did not know anything about this is absurd.  Further, Blaugrund was paid back $50,000 from her mother even though she never tendered this amount.

69.     I explained to Mr. Schulte that as to paragraph 29 of the PSR, Timothy Grosse was repaid his money from our attorney's trust account (Grant Walsh) after the terms of the Option to purchase were met and signed, just as the contract provided.

**009**

Grosse worked in our store for 30 days, and nothing was hidden from him. He observed the entire operation. Grosse was returned his entire $25,000 once he signed the noncompete and nondisclosure agreements.

70. I explained to Mr. Schulte that as to paragraph 30 of the PSR, Anjum Farooqi did not follow up on his option to purchase. He signed a franchise agreement that provides for a nonrefundable franchise fee. He did not do what he agreed to in the contract.

71. I explained to Mr. Schulte that as to paragraph 31 of the PSR, Juan Carlos Ledesma was with the company from the very beginning. He knew what was leased and what was not. He bounced his last check to the company and still owes the company money which was listed in the bankruptcy assets listing.

72. I explained to Mr. Schulte that as to paragraph 32 of the PSR, Ray Woolston never completed paying for his store. He failed to complete the purchase.

73. I explained to Mr. Schulte that as to paragraph 33 of the PSR, the Las Colinas location was **never** sold to multiple people at the same time. Las Colinas was presented as an option to purchase for the three parties. They were returned their money before it was optioned to someone else. There was nothing illegal about this.

74. Further, even though I told Mr. Schulte numerous times before I pleaded guilty and after I received the PSR that the actual losses of the franchisees were not what they claimed, that some of the stores were still operational, and in fact the total alleged loss to the franchisees reflects only what they tendered for the franchises and not what the equipment and restaurants were actually worth, Mr. Schulte did not address these issues despite my discussing this information with him at least several times. A snapshot breakdown of the actual losses to the franchisees is attached as Exhibit 5, and the detailed explanation of each breakdown follows below. Exhibit 5 is a snapshot that I created with my attorneys for the purposes of this case. Exhibits 6-32 are documents that were kept in the regular course of business of Salad Bowl. I was one of the custodian of records for Salad Bowl and I am familiar with the manner in which its records are created and maintained by virtue of my duties and responsibilities. Attached as Exhibits 6-32 are 146 pages of records. These are the original records or duplicates of the original records. The records were made at or near the time of each act, event, condition, opinion, or diagnosis set forth. Some of the records were received by Salad Bowl in the regular course of business. The records were made by, or from information transmitted by, persons with knowledge of the matters set forth. The records were kept in the course of regularly conducted business activity. None of these records were created for this present litigation.

75. As stated in paragraph 64, we paid for the construction and start-up costs of the stores franchised by Gampel.

**010**

76.     Specifically, as shown by Exhibit 6, a portion of the funds received from Gampel covered costs for Charlie's Fixtures in the amount of $4,133.56.

77.     As shown by Exhibit 7, a portion of the funds received from Gampel covered costs for three refrigerators from Samsung Fixtures totaling $10,818.00.

78.     As shown by Exhibit 8, a portion of the funds received from Gampel covered costs for the services of an architect, as required by the lease with the property owner, from Milan LOJDL, totaling $4,800.00.

79.     As shown by Exhibit 9, a portion of the funds received from Gampel covered costs for signage totaling $5,113.02, for the store at 302 N. Canon Drive, Beverly Hills, California 90210.

80.     As shown by Exhibit 10, a portion of the funds received from Gampel covered costs for construction, provided by Numa Construction in the amount of $47,800.00.

81.     As shown by Exhibit 11, a portion of the funds received from Gampel covered costs for building permits on the Beverly Hills location in the amount of $7,339.56.

82.     As shown by Exhibit 12 and 13, a portion of the funds received from Gampel covered costs of rent on the Beverly Hills location for the months of June and July 2010, two of the three months I covered totaling $25,216.74, after Gampel purchased the franchise, during which construction remained on-going, but prior to the store opening in late August 2010.

83.     As shown by Exhibit 14 and 15, a portion of the funds received from Gampel covered costs of bar stools for the Beverly Hills location, totaling $730.94.

84.     As shown by Exhibit 16, a portion of the funds received from Gampel covered costs of equipment from Star Restaurant Equipment in the amount of $265.54.

85.     As shown by Exhibits 17, 18, and 23, a portion of the funds received from Gampel covered costs of startup foodstuff for the Beverly Hills location totaling $3,023.26.

86.     As shown by Exhibit 19, a portion of the funds received covered travel costs totaling $3,292.03 for the corporate staff to the Beverly Hills location during the final months of construction and training—which as shown in the franchise agreements, and above in paragraph 57 and 59, is what franchise fees are given to cover, in part.

87.     As shown by Exhibits 20 and 21, a portion of the funds received from Gampel covered costs of miscellaneous supplies for the Beverly Hills location totaling $923.38.

**011**

88.    As shown by Exhibit 22, a portion of the funds received from Gampel covered costs of electricity during the final month or two of construction on the Beverly Hills location totaling $1,833.99.

89.    As shown by Exhibit 24, I negotiated a tenant build out allowance for Gampel with regard to the Fort Bliss location in the amount of $117,888.50.  This is a value received due only to Mr. Chen's franchisee relationship.  This amount, therefore, must be deducted from any loss amount, as required by the Sentencing Guidelines.

90.    Gampel opened the Beverly Hills Salad Bowl location, and received the marketing, training, and benefits required of the initial franchise fee.  The franchise fee of $25,000.00 should not have been included in the loss amounts.

91.    I had the exclusive lease to the Fort Bliss location and the value that Gampel received in becoming a franchisee allowed him to open a restaurant, even if not a Salad Bowl restaurant, at that premium location.  This benefit, in addition to the benefit received under paragraph 89, was only possible through the payment of the franchise fee.  Therefore, the franchise fee paid for the Fort Bliss location should not have been figured in the loss amount.

92.    Total value received by Gampel as evidenced in paragraphs 75 through 91 is at least $140,290 for the Beverly Hills location and $142,888 for Fort Bliss.  When you take the claimed loss of $687,615 and reduce it by $140,290 for the Beverly Hills location and by $142,888 for Fort Bliss, the actual adjusted loss to Gampel that should have been considered is **no more than $405,041.**

93.    As shown by Exhibit 25, a portion of the funds received from Alyson Corral for the Western Center location covered costs of a point of sale system from T3, totaling $7,775.07.

94.    As shown by Exhibit 26, a portion of the funds received from Alyson Corral for the Western Center location covered costs of construction plan review by the City of Fort Worth, totaling $200.00.

95.    As shown by Exhibit 27, a portion of the funds received from Alyson Corral for the Western Center location covered costs of construction totaling $70,875.00.

96.    Alyson Corral opened the Western Center Salad Bowl location, and received the marketing, training, and benefits required of the initial franchise fee.  The franchise fee of $25,000.00 should not have been included in the loss amounts.

97.    Total value received by Alyson Corral, as evidenced in paragraphs 94 through 96, is at least $78,850.07 for the Western Center location, negating the entire loss amount claimed by Corral.

**012**

98.    As shown by Exhibit 28, and as discussed above in Paragraph 65, Leo Martinez purchased a "right of refusal" as to the Fort Bliss location for $25,000.00. He declined to exercise that right, and the $25,000.00 was refunded to him via cashier's check.

99.    As shown by Exhibit 29, a portion of the funds received from Leo Martinez for the Aurora location covered costs of construction totaling $84,974.77.

100.    As shown by Exhibit 30, a portion of the funds received from Leo Martinez for the Aurora location covered costs of a point of sale system from T3, totaling $9,697.46.

101.    As shown by Exhibit 31, a portion of the funds received from Leo Martinez for the Aurora location covered costs of smallwares from Sysco totaling $1,123.61

102.    Leo Martinez opened the Aurora Salad Bowl location, and received the marketing, training, and benefits required of the initial franchise fee. The franchise fee of $25,000.00 should not have been included in the loss amounts.

103.    Total value received by Leo Martinez, as evidenced in paragraphs 98 through 102, is at least $145,795.84. Martinez claimed a loss of $220,000, and this amount less $145,795.84 equals a total adjusted loss of **no more than $74,204**.

104.    As shown by Exhibit 31, I negotiated a tenant buildout allowance for Eddie Chen with regard to the Fort Bliss location in the amount of $117,888.50. This is a value received due only to Mr. Chen's franchisee relationship. This amount, therefore, should have been deducted from any loss amount as required by the Sentencing Guidelines.

105.    Eddie Chen opened the Dallas Salad Bowl location, and received the marketing, training, and benefits required of the initial franchise fee. The franchise fee of $25,000.00 should not have been included in the loss amounts.

106.    Total value received by Eddie Chen, as evidenced in paragraphs 98 through 102, is at least $63,992.86, lowering the amount that should have been considered as loss to the pleaded amount of $100,000.00.

107.    Henry and Mason Crane opened the Albuquerque Salad Bowl location, and received the marketing, training, and benefits required of the initial franchise fee. The franchise fee of $25,000.00 should not have been included in the loss amounts.

108.    Total value received by Henry and Mason Crane, as evidenced by paragraph 107, is at least 25,000.00, excluding the build-out allowance already excepted under the final PSR. This lowers the amount that should have been considered as a loss to no more than $47,672.56.

**013**

109.   As is typical in the franchise industry, the initial $25,000.00 was not an investment, but rather provided the right—should all other agreements be met—to open a "The Salad Bowl" location. Franchise fees and royalty percentage fees are standard in the industry. The Franchising Disclosure Document (FDD) listed in detail what was provided as part of the $25,000 initial franchise fee and the royalty fees paid on sales.

110.   At a minimum, for these fees, the Franchisee was entitled to: use "The Salad Bowl" name, logo, and likeness; assistance with site selection and lease negotiation; training both at the corporate location in Texas and at the franchisee's location; access to the corporate chef, who could answer any food questions pertaining to "The Salad Bowl" menu; a "Manager Training Guide;" "Employee Manuals," in both English and Spanish; a complete "Nutritional Guide" providing detailed nutritional information for each food item on "The Salad Bowl" menu; access to the "Franchisee Help Hotline," directly connecting franchisees with the corporate office; access to unlimited training via phone; use of the marketing manual, which contained finalized advertisements, logos, and other marketing materials; access to a fully "wrapped" mobile advertisement—The Salad Bowl mobile; assistance with marketing and public relations in their local market; and, the presence of corporate representatives to assist with Franchisee's grand opening and ribbon cutting.

111.   The franchise fee was a direct payment to "The Salad Bowl Corporation" and was earned under the terms of the agreement in each of the locations.

112.   As shown in Paragraph 31 of the PSR and as adopted by the Court, Juan Ledesma was well aware of any "fraudulent" issues. However, his primary purpose in the purchase of the store was to gain the right to use the back half of the location for his catering business. The Roanoke "The Salad Bowl" location remains open today, thus any franchise fee was well earned and not fully paid. Thus, Juan Ledesma had a zero actual dollar loss.

113.   Although I never agreed to be held liable relevant conduct of any of these amounts, especially as to possible additional time in prison, after considering the calculations above, and even if one adds the alleged losses listed in the final judgment on the last page, Restitution Attachment List of Victims, of Eddie Chen ($100,000); Joseph Leszko ($21,000); Leo Martinez ($74,204); Ray Woolston ($100,000); Anjum Farooqi ($25,000); Henry and Mason Crane ($42,673); Kroll, Meir and Blaugrand ($51,100); and Yuri Gampel ($405,041), the total actual loss amount would have not more than $819,018, which is less than $1,000.000.  And, the total number of alleged victims would have been eight:

**014**

| | |
|---|---|
| **Alyson Corral** | **0** |
| **Eddie Chen:** | **$100,000** |
| **Joseph Leszko** | **$21,000** |
| **Leo Martinez** | **$74,204** |
| **Ray Woolston** | **$100,000** |
| **Anjum Farooqi** | **$25,000** |
| **Henry and Mason Crane** | **$42,673** |
| **Juan Ledesma** | **$0** |
| **Kroll, Meir and Blaugrand** | **$51,100** |
| **Yuri Gampel** | **$405,041** |

**TOTAL LOSS AMOUNT – not more than        $819,018**

114.  Mr. Schulte had at all times pertinent to this case all of the relevant documents showing the values received by the franchisees listed in this declaration and all the documents attached to this declaration.   Although Mr. Schulte had all of the files related to the expenses involved in the build out and set up of each store, Mr. Schulte failed to consider these costs as they related to value received by the franchisee, which should have been deducted from any amount considered as relevant conduct, or owed as restitution.

115.  Taking into account the evidence provided in this declaration and in the attached exhibits,, had Mr. Schulte taken the proper steps to show value received by the franchisees, the total amount that should have been considered for relevant conduct and restitution would have been no more than $819,018.

116.  I fully understand the contents of this declaration, and I read, write, and speak English.

End of testimony.

15                                        **015**

## DECLARATION

Under 28 U.S.C. § 1746 and Texas Civil Practice and Remedies Code § 132.001 *et seq.*, I declare under penalties of perjury that my name is Michael Carroll. I am over the age of 18 years, and am competent to make this declaration. My date of birth is March 9, 1977. I am presently incarcerated at FCI Seagoville, 2113 N. Hwy 175, Seagoville, TX 75159. This document is not a lien required to be filed with a county clerk, an instrument concerning real or personal property required to be filed with a county clerk, or an oath of office or an oath required to be taken before a specified official other than a notary public. I have not been forced to sign this declaration. I declare that under the penalties of perjury that all assertions provided in this document are correct and true.

Executed on ___October 23, 2015___ (date), in Dallas County, Texas.

SIGNATURE OF DECLARANT

16

**016**

Sentencing Guidelines - Carroll

| | Current Gov't Figure | Current Defendant Figure | New Defendant |
|---|---|---|---|
| Wire Fraud | 6 | 6 | 6 |
| Loss Amount | 16 | 14 | 16 |
| Victims | 2 | 0 | 0 |
| Sophisticated Means | 2 | 2 | 2 |
| Use of Personal Information | 2 | 0 | 0 |
| | | | |
| Acceptance | | -3 | -3 |
| | | | |
| **FINAL LEVEL:** | **28** | **19** | **21** |

GUIDELINES:
Level 28:               78-97 Months
Level 25:               57-71 Months
Level 21:               37-46 Months
Level 19:               30-37 Months

**Exhibit 1**
017

"Peter A. Schulte" <pete@schulteapgar.com> ✉          September 11, 2013  6:44 PM
To: Michael Carroll <carrollcrazychef@aol.com>
Cc: Anita Davis <anita@schulteapgar.com>
Update



2 Attachments, 98 KB

Michael,

I just filed an AGREED Motion for Continuance (attached), so I do not believe Judge Godbey
will deny it.  David Jarvis decided late this evening to NOT OPPOSE the Motion for
Continuance. The sentencing hearing will be scheduled sometime in late November or early
December if granted by the Court (proposed dates included in attached Motion).

I had a lengthy conversation with Special Agent Chris Smith with the FBI today regarding
Benavides and Gampel.  He is providing me a list of the payments made to you by them.

## YURI GAMPEL

Gampel has proof that he has supplied the FBI that he made the following payments to you:

1. **June 14, 2010** - TWO payments made via check in the amount of $64,432.50, equaling
$128,865.00   ~1st set franchise + sales - $50,000   - Had payroll
2. **July 21, 2010** - $56,250.00 (check)                                    - Staff wds IS
3. **August 12, 2010** - $150,000.00 (check)                           - Sngle deposit for him
4. **August 16, 2010** - $15,000.00 (check)                            - m·ws sales - relieved
5. **September 8, 2010** - $112,500.00 (check)
6. **September 9, 2010** - $225,000.00

## TOTAL: $687,615.00.

Gampel states that he did not begin working at the Las Colinas location until late September or
October… so all of his payments would have been made *before* he started working at the Las
Colinas location (very different from what we discussed earlier this week).  Gampel's position is
that when he worked at the store for three months he discovered that the financials you
provided him in May of 2010 were vastly inflated and thereby fraudulent.  He also provided a
copy of a "corporate management agreement" dated June 14, 2010.  In that agreement it
states that you maintained control of the Salad Bowl location and corporation, even though
Gampel was "managing" the store.  Finally, Gampel states that after he worked at the Salad
Bowl for the three months, he asked for his money back.  He also said that you and him had an
agreement that he could have all his money back if he decided after working at the Las Colinas
store that he no longer wished to invest.  If these alleged facts about when payments were
made and statements made by Gampel are NOT true, **please provide me written or other
substantial evidence to the contrary.**

# Exhibit 2
## 018

*Nood Copies*  */ Collinsville Cafe*
*↳ 60,000*

### RICHARD BENAVIDES

The FBI Agent will provide me a total of the payments made to you from him as his investment. Benavides states that you never told him about your bankruptcy issues and that you told him you had opened successful restaurants in the past which help induce his agreement to invest with you. He told the agent that he would have never invested with you if he had known that information. Further, he told the agent your agreement with him was that you would match dollar for dollar the amount of money that he invested in the 45-45-10 agreement. He told the agent that after he found out after putting the **$919,032.77** into the business that you had not put any of your money into the business. He also discovered that information you had told him was fraudulent in 2010. The FBI Agent told me he has copies of all the checks equaling that amount and I am currently waiting for him to forward me copies of said payments.

### FRANCHISE AGREEMENTS

You have told me for months that you have signed franchise agreements with each franchisee where you disclose the bankruptcy proceedings. I NEED those documents ASAP… If you don't have them, I need to know that as well.

### WHAT DOES THIS MEAN:

This means if the government proves that Gampel and Benavides were fraudulently induced to give you the amount of money they "invested," that puts this case well into the "1 million to 2.5 million" sentencing level. The FBI agent told me he will not be able to prove over 2.5 million, but believes he can prove over 1 million. With that being said, **with three level credit for "acceptance of responsibility**, that puts this case at a "37-46 months" range for that dollar loss amount. The government is alleging that you used "sophisticated means" (+2 levels) and you fraudulently disseminated Benavides' personal information to facilitate the alleged schedule (+ 2 levels). Therefore, the government puts you at a Level 25, which is "57-71 months."

Without solid contradicting evidence from you regarding these loss amounts, I believe our best defense is to **not dispute that the alleged loss amount is between 1 million and 2.5 million**, but continue to dispute and OBJECT TO the "sophisticated means" and that you fraudulently disseminated Benavides' personal information. That will remove the additional 4 levels and get this case to a **Level 21, which is "37-46 months" on the guidelines.** 2/2 you

If we object TO ALL alleged relevant conduct in excess of the $100,000 paid by Eddie Chen as we discussed this week, and the government is successful in proving the alleged conduct to be between 1 million and 2.5 million, we risk losing the 3 level "acceptance of responsibility" departure on the guidelines. That will put the case between a Level 24 (51-63 months) without the 4 levels for sophisticated means and fraudulent use of Benavides personal information if the Court does not agree with the Government, TO Level 28 (78-97 months) if the Judge does agree with the Government on those 4 levels. Therefore, that is the **risk** of disputing/objecting all the alleged "relevant conduct."

**019**

## SUMMARY

As your lawyer, I will obviously do whatever you instruct me to do.  My best advice at this point WITHOUT further written or substantial evidence from you to contradict the government's position on loss is to not object to the loss amount of being between 1 million and 2.5 million BUT continue TO object to the 4 added levels for the alleged "sophisticated means" and the alleged "unauthorized public dissemination of Benavides' personal information."  If the Judge agrees with us, then the sentencing guidelines put this at a **Level 21 (37-46 months).**

Please get me any additional information requested herein by MONDAY, SEPTEMBER 16, 2013.  Once you have a chance to digest all of this information, PLEASE contact Anita to schedule a meeting with me next week.  I will let you know when I hear if our Motion for Continuance is granted so we can push that meeting off if you prefer.

Please also confirm receipt of this email. Thanks.



2nd Motion...2013 (78 KB)

**Peter A. Schulte, Esq.**
Attorney at Law



### SCHULTE & APGAR PLLC
Attorneys and Counselors at Law

4131 N. Central Exwy, Ste 680
Dallas, TX 75204-2171
Office: (214) 521-2200
Facsimile: (214) 276-1661
E-mail: pete@schulteapgar.com
Web: http://www.PeteSchulte.com

**\*Peter A. Schulte is licensed as an Attorney in both Colorado & Texas**

**NOTICE REGARDING SERVICE BY ELECTRONIC MAIL:**
This e-mail address is NOT available for service of any pleadings in any matter, without the express written consent of Mr. Schulte to accept service in a specific matter via electronic mail.  Any service of

**020**

pleadings must be done in accordance with the Texas Rules of Civil Procedure.  Any pleadings received via e-mail without this authorization and/or not in accordance with the Texas Rules of Civil Procedure will be ignored.

### CONFIDENTIALITY NOTICE:

This email together with any attachments is confidential, intended only for the recipient or recipients named above and may contain information that is privileged, confidential, attorney work product or exempt from disclosure under applicable law. If you have received this email in error, or are not the named recipient(s), you are hereby notified that any use, dissemination, distribution or duplication of this email or any of its attachments is strictly prohibited. Please notify the sender immediately and delete this email and any attachments from your computer. You should not retain, copy, use or distribute this email or any attachments for any purpose, or disclose all or any part of the contents to any person.



PRIVILEGED
CONFIDENTIAL

On Sep 12, 2013, at 5:30 PM, carrollcrazychef <carrollcrazychef@aol.com> wrote:

First off, you are my attorney, if i need it explained, and obviously i do, you should explain it again and again since now i am facing jail time. A lot more than ever shared with me. And the govt has no evidence. What they have is people saying that i said something. So far i have not seen any evidence from them. Show me the cancelled checks equaling that amount. I bet they don't have them. As for the fdd, we discussed it thoroughly in your office one meeting. I pulled it up on my computer and emailed it to you while you sat at your desk. I have been asking you to use the fdd since day one. Now all of a sudden it is important. Again a contract like i have said disproves Richards story and Eddie Chen. And anyone else who says they did know i had a bk. As for the trust account it says that i am not required to put money in a trust account. In the contract they all signed. I will resend it to you.
Michael Carroll



Sent from my Samsung Galaxy Note™, an AT&T LTE smartphone

"Peter A. Schulte" <pete@schulteapgar.com> wrote:
I have explained this to you over and over again in each of our several in-person meetings and have sent you detailed emails explaining the process again over the last couple weeks. The email from last night explains how things could go very bad and you get 9 years if we continue to object to all other conduct and the judge finds otherwise.  Again, when you have a chance to digest and read (or re-read) those emails in detail please contact Anita to schedule an appointment with me so I can go in detail with you.

Without further tangible information contradicting the evidence in the hands of the government, yes, things don't look good! That's why I need more then just blanket denials on your part... I need tangible evidence!

With that being said, do you have any other documents?  Please advise as soon as possible or tell me if you dont have them. And you never sent me the disclosure as stated... Please re-forward the email you sent.  Thanks.

---

Peter A. Schulte
Schulte & Apgar, PLLC
4131 N Central Exwy Ste 680
Dallas, Texas 75204
Ofc: 214.521.2200
Fax: 214.276.1661
pete@schulteapgar.com
www.PeteSchulte.com

Sent from my iPhone... Please pardon any grammatical and/or spelling mistakes...

**Exhibit 3**
022



On Sep 12, 2013, at 3:44 PM, carrollcrazychef <carrollcrazychef@aol.com> wrote:

The first big thing is the fdd which i provided you in an email and a hard copy to you. That will ruin the story that Richard benavides and Eddie Chen and anyone else said that they did not know about bk. It Is in the contract they all signed. I talked about those for 8 months. I wanted to bring that to the government's attention for 8 months. Now it is important. I don't understand the legal process and i don't understand why i am looking at 9 years. Can we call every one of them to the stand like you told me we can? Can i change.my.plea? basically you are now telling me i am screwed either way

Michael


Sent from my Samsung Galaxy Note™, an AT&T LTE smartphone

"Peter A. Schulte" <pete@schulteapgar.com> wrote:
Michael,

Again, please forward me the Disclosure documents to me IMMEDIATELY. I have never told you that I did not want to bring them up... I have always told you I need them for sentencing - and I still do not have them in my possession. If they exist, I need them as soon as possible.  As far as the continuance is concerned, the Court resets these cases for up to two months at a time... we would never get a January setting from September.  We are lucky enough that I was able to get Jarvis to agree to this continuance.

Mike - this is crunch time.  You keep telling me that the information being provided to the FBI is false and that the individuals are lying to the FBI.  However, you continue to not provide me with any tangible evidence to use to contradict their stories - information I have been asking for from you for MONTHS.  If it doesn't exist, then tell me.  If it does exist, get it to me immediately.

I need to be very clear with you... if sentencing goes forward a week from Monday, it is my belief that you will receive a significant amount of jail time.  As my last e-mail to you stated, if we move forward with no further concrete information from you to contradict the alleged victims in this case, you are going to be spending the next 5-9 years of your life in federal prison.   Again, if that information exists, get it to me.

I am still having much difficulty understanding how your version of events is so different from every other alleged victims version.  This is beyond a "business deal gone bad." There is no doubt at this point that the government will be able to prove fraudulent statements were made to induce some of the people to purchase franchises in the Salad Bowl.  If you can provide me a detailed accounting of where the 2.4 million dollars you received was spent, that would be helpful.  However, you have told me numerous times that this information is not available.  If it is available, get it to me.

**023**

CONFIDENTIAL
PRIVILEGED

37 months under the current information available IS a win for you in this case in our current situation. 9 years in federal prison is a much different situation. When we discussed probation in the very beginning of this case months ago, you told me that the government would not be able to prove beyond the $100,000 you pleaded guilty to in April. The facts have substantially changed since then. Probation is very unlikely under the current fact situation, as we have discussed.

My job is to mitigate the consequences and to get this case down to the lowest possible punishment under the law. I can only work within the evidence and the law. At this point, the government seems to have a lot of evidence against you. Please don't let my frank statements to you deter from the fact that I am **on your side in this case**. You need to know the good, the bad, and the ugly. I have always be very up front with you about this case. Based on your last email communication to me, it seems that you have lost confidence in me as your lawyer in this case. If that is the case, perhaps you should retain other counsel. I do hope that is not the case, as I am continuing to work very diligently on your behalf.

Again, I will do whatever you instruct me to do in this case. If you want me to continue to object to the relevant conduct, I will do that. Please note, however, that I do not believe that is a wise decision based on the information available to me **at this moment**. Hopefully with a continuance, you can provide me more information. PLEASE get that information to me no later than Monday, September 16, 2013 at 5:00pm.

**Peter A. Schulte, Esq.**
Attorney at Law



4131 N. Central Exwy, Ste 680
Dallas, TX 75204-2171
Office: (214) 521-2200
Facsimile: (214) 276-1661
E-mail: pete@schulteapgar.com
Web: http://www.PeteSchulte.com

*Peter A. Schulte is licensed as an Attorney in both Colorado & Texas

**024**

CONFIDENTIAL
PRIVILEGED

**NOTICE REGARDING SERVICE BY ELECTRONIC MAIL:**
This e-mail address is NOT available for service of any pleadings in any matter, without the express written consent of Mr. Schulte to accept service in a specific matter via electronic mail. Any service of pleadings must be done in accordance with the Texas Rules of Civil Procedure. Any pleadings received via e-mail without this authorization and/or not in accordance with the Texas Rules of Civil Procedure will be ignored.

**CONFIDENTIALITY NOTICE:**
This email together with any attachments is confidential, intended only for the recipient or recipients named above and may contain information that is privileged, confidential, attorney work product or exempt from disclosure under applicable law. If you have received this email in error, or are not the named recipient(s), you are hereby notified that any use, dissemination, distribution or duplication of this email or any of its attachments is strictly prohibited. Please notify the sender immediately and delete this email and any attachments from your computer. You should not retain, copy, use or distribute this email or any attachments for any purpose, or disclose all or any part of the contents to any person.

On Sep 12, 2013, at 2:26 PM, Michael Carroll <carrollcrazychef@aol.com> wrote:

Pete,

I just received 2 emails from you. I truly believe I am totally being screwed in this situation. I have been telling you from the beginning about the federal disclosure documents. I wanted to use them 6 months ago and you did not want to bring them up. The fact that someone including Richard benavides says I did not disclose my bk is bullshit. I have disclosed that from the very beginning. I would also like to see the checks he says he gave me as that list is bull shit as well.

Also on the continuance I was asking for January as I stated in a previous email. I feel as if all of a sudden the fight is not there for you to win this case. You feel that me going to jail for 4 years is better than 9 is a win. Why would I have pled guilty if they could still get me on the entire case anyway. Now, I am lumped in there with a common criminal and they must assume I am guilty since I pled to something. I feel you even have me in this category as you want me to agree to a lesser number of jail time. Even the list that yury sent over is a list not proof. The checks he deposited that I believe was the dates was different. Also, he says I told him i would return his money at anytime? Really, name any business person who would agree to that. He took over the las colinas store and paid all the bills, all the staff including the manager on sight. They took in the money. I did not. So therefore he knew the financials of his own company. Yet he still built more. This is ridiculous. It is a he said she said and I am already guilty. I do not believe I was shared and explained this relevant conduct clause as I am screwed even with my plee. I want everyone put on the stand. I want everyone, not just the special agent called to the stand to testify. Especially if the govt is saying that is what they said. I tried giving you the fdd's

months ago and you said that is what we would use at sentencing and now it is totally biting me in the ass. I even showed you the fdd in your office and emailed it to you as we sat there so you would have copy and I gave you the hard copy of the old one. It lists the bk from the beginning. I know you keep saying contract does not matter but how do I defend myself from people saying I did something without using the paper that says I did not. I aM the one getting bent over here and I will not do 9 years over something that is bs.

Michael Carroll

Sent from AOL Mobile Mail

CONFIDENTIAL
PRIVILEGED

-----Original Message-----
From: Peter A. Schulte <pete@schulteapgar.com>
To: Michael Carroll <carrollcrazychef@aol.com>
 The hard copy Sent: Thu, Sep 12, 2013 12:00 PM
Subject: Fwd: Benavides confirmed payments to Carroll.

See below.

_____

Peter A. Schulte
Schulte & Apgar, PLLC
4131 N Central Exwy Ste 680
Dallas, Texas 75204
Ofc: 214.521.2200
Fax: 214.276.1661
pete@schulteapgar.com
www.PeteSchulte.com

Sent from my iPhone... Please pardon any grammatical and/or spelling mistakes...

Begin forwarded message:

**From:** "Smith, Christopher M. (DL)(FBI)" <Christopher.Smith3@ic.fbi.gov>
**Date:** September 12, 2013, 11:56:03 AM CDT
**To:** "Peter A. Schulte" <pete@schulteapgar.com>
**Subject: RE: DRAFT Carroll 2nd MTC**

Pete, the investments by Benavides are as follows:
11/4/2008 - $75,000
11/20/2008 - $25,000
12/19/2008 - $107,500
1/16/2008 - $107,500
2/11/2009 - $75,000
3/3/2009 - $110,100
3/17/2009 - $75,000

**026**

3/31/2009 - $75,000
4/21/2009 - $25,000
4/21/2009 - $15,500
5/11/2009 - $85,000
9/24/2009 - $75,000
11/10/2009 - $68,432.77

Total - $919,032.77

Thanks,
Chris



**From:** Peter A. Schulte [pete@schulteapgar.com]
**Sent:** Wednesday, September 11, 2013 5:56 PM
**To:** Jarvis, David (USATXN)
**Cc:** Smith, Christopher M. (DL)(FBI)
**Subject:** DRAFT Carroll 2nd MTC

The draft of the U.S. v. Carroll - Defendant's 2nd Motion for Continuance is attached.... Let me know what your position is after reviewing the document.  Thank you sir.

027

Peter A. Schulte <pete@schulteapgar.com>          September 12, 2013  5:48 PM
To: carrollcrazychef <carrollcrazychef@aol.com>
Bcc: "Jonathan M. Apgar Esq." <jon@schulteapgar.com>, Anita Davis
<anita@schulteapgar.com>
Re: Benavides confirmed payments to Carroll.



**CONFIDENTIAL**
**PRIVILEGED**

This is why I am committing everything to writing so we are on the same page.

Please send me a detailed explanation on why you feel that the "government has no evidence." In fact, they do, Michael. Lots of it. I don't know what else I need to do to get you to understand that putting your head into the sand and ignoring what the franchisees are telling the government does you no good in this case. I need **solid, tangible evidence to back up what you are telling me.** To this date, I have received nothing from you but blanket denials. You have a copy of the binder of the evidence in the hands of the Government... Do you not still have it? If not, I can make arrangements to get it to you.

I do remember the meeting where we went over the ONE FDD and you said you would get me a copy as you could not connect your computer to the internet to send it to me while you were sitting in my office. It was never received. I also have never received copies of the 15 or so other FDDs you told me you have in your possession. Furthermore, I never told you that those documents were "not important." I *always* told you that I would need them for sentencing. I have been asking you for those documents for months.

I have been telling you for months now that you are facing prison time in this case based on the evidence that the government has against you and **absent any further tangible information from you, that will occur.** I need whatever you have in your possession immediately. PLEASE send it to me. I need it by Monday, September 16, 2013 at 5:00pm. If I don't receive anything by then, I will have to move forward in preparing for this case under the understanding no other information exists.

Finally, if you would like to **withdraw your plea,** please let me know in writing and I will file the motion. I have a strong feeling David Jarvis will not object to such a request, although I have not broached the subject with him. If the Judge allows you to withdraw your plea, it will place this case back to April and the Government will move to have you indicted on several counts and then the case will be set for trial very quickly. In that situation, you will not be entitled to the three level credit for "acceptance of responsibility," which will push this case well past Level 21 discussed in my previous emails to you, plus subject you to additional counts beyond the one wire fraud count.

Please let me know how you wish to proceed.

PS

**Exhibit 4**
**028**

**Exhibit 5: Snapshot of the Breakdown of Actual Losses to the Franchisees**

- **Yuri Gampel (Claimed $687,615.00; adjusted and actual loss is not more than $405,041)**
    - ◦ Beverly Hills:
        - ▪ (Exhibit 6) Fixtures $4,133.56 (Receipt)
        - ▪ (Exhibit 7) Fixtures $10,818.00 (receipt)
        - ▪ (Exhibit 8) Architect $4,800.00 (receipt and check #)
        - ▪ (Exhibit 9) Signage $5,113.02 (quote only)
        - ▪ (Exhibit 10) Construction Co. $47,800.00
        - ▪ (Exhibit 11) Building Permits $7,339.56
        - ▪ (Exhibits 12 and 13) June and July 2010 rents after contract with Gambel, during construction $25,216.74
        - ▪ (Exhibit 14) Plummers (Bar stools) $645.33
        - ▪ (Exhibit 15) Plummers (bar stool) $85.61
        - ▪ (Exhibit 16) Star Restaurant Supply $265.54
        - ▪ (Exhibits 17 & 18, 23) Start up food-stuff $3,023.26 (receipts)
        - ▪ (Exhibit 19) Travel expenses Carroll during final month of construction $3,292.03 (receipts)
        - ▪ (Exhibits 20 & 21) Supplies $923.38 (receipts)
        - ▪ Franchise fee earned at store opening $25,000.00
        - ▪ (Exhibit 22) Electric for June and July 2010, $1,833.99

        **Total value received for Beverly Hills: $140,286**

    - ◦ Fort Bliss
        - ▪ $25,000 franchise fee earned because of value received for space
        - ▪ (Exhibit 24) Negotiated a $117,888.50 Tenant Buildout Allowance that Gampel received when store opened
        - ▪ Gampel still received value of the space on a military base and the TBA that Carroll negotiated because Carroll was on the lease and had garnered the authority for the space. This does not change merely because a Salad Bowl was not opened.

        **Total value received for Fort Bliss: $142,288**

**Actual loss: $687,615 (claimed) less $140,290 less $142,288 = not more than $405,041**

**029**

- **Alyson Corral—Western Center (Claimed $44,000, adjusted loss amount is zero)**
  ◦ (Exhibit 25) POS System from T3: $7,775.07 (cashier's check/invoice)
  ◦ (Exhibit 26) Plan Review by City of Fort Worth: $200.00
  ◦ (Exhibit 27) Construction Buildout (per spec sheet)  $70,875.00
  ◦ Franchise fee $25,000.00

  **<u>Zero actual loss for Corral</u>**

---

- **Leo Martinez (claimed $220,000.00, adjusted loss amount is not more than $74,204)**
  ◦ $25,000 franchise fee earned on opening of Aurora
  ◦ (Exhibit 28) $25,000 first right fee for Ft. Bliss refunded (cashier's check as proof)
  ◦ Paid $195,000 in a buy one/get one for Aurora (Denver Sheraton was "free")
  ◦ (Exhibit 29) Construction Costs paid $84,974.77
  ◦ (Exhibit 30) POS System $9,697.46
  ◦ (Exhibit 31) Smallwares from Sysco $1,123.61
  ◦ **Value received: $120,795** (not including Tenant Allowance already accounted for in PSR)

  **<u>$220,000 (claimed) less $145,795 = actual loss of not more than $74,204</u>**

---

- **Henry and Mason Crane (Albuquerque location claimed $67,672.56 in losses)**
- $25,000 for franchise fee—value received at store opening

  **<u>$67,673 claimed less $25,000 = actual loss of not more than $42,673</u>**

**030**

- **Eddie Chen – Claimed loss of $163,992, but received value of $100,000.**
  - ◦ Adjusted to pleaded amount of not more than $100,000
  - ◦ $25,000 franchise fee – opened and operated as Salad Bowl.
  - ◦ As shown in Exhibit 32, I negotiated a $75,000 tenant buildout allowance for Chen's Dallas Salad Bowl location.
  - ◦ Per the United States Sentencing Guidelines, this is value received by Chen.

**Adjusted Loss total:**

| | |
|---|---|
| **Alyson Corral** | **0** |
| **Eddie Chen:** | **$100,000** |
| **Joseph Leszko** | **$21,000** |
| **Leo Martinez** | **$74,204** |
| **Ray Woolston** | **$100,000** |
| **Anjum Farooqi** | **$25,000** |
| **Henry and Mason Crane** | **$42,673** |
| **Juan Ledesma** | **$0** |
| **Kroll, Meir and Blaugrand** | **$51,100** |
| **Yuri Gampel** | **$405,041** |

_____

**TOTAL – not more than     $819,018**

# CHARLIE'S FIXTURES, INC.

2251 VENICE BLVD.
LOS ANGELES, CA 90006
PHN : (323) 731-9023
FAX : (323) 731-0318



**INVOICE**

**No. O0016780**

Date: 7/14/2010      Salesperson: Abigail

| BILL TO: | SHIP TO: |
|---|---|
| SALBOW<br>THE SALAD BOWL<br>350 N CANON DRIVE<br>BEVERLY HILLS, CA  90210 | MARK GANGLER<br>THE SALAD BOWL<br>350 N CANON DRIVE<br>BEVERLY HILLS, CA  90210 |

TITLE OF ALL MERCHANDISE LISTED HEREON SHALL REMAIN THE PROPERTY OF CHARLIE'S FIXTURES, INC UNTIL FULL PURCHASE PRICE PAID. A CHARGE OF 1.5% PER MONTH WILL BE MADE ON ALL BALANCES OVER 30 DAYS OLD...

| YOUR ORDER NO. | | SHIP VIA | | F.O.B. POINT | | | TERMS |
|---|---|---|---|---|---|---|---|
| | | OUR TRUCK | | | | | COD |

| PART NUMBER / DESCRIPTION | EST. DATE | | QTY ORDERED | UOM | UNIT PRICE | DISD % | EXTENDED PRICE |
|---|---|---|---|---|---|---|---|
| THUSLMB008<br>THUNDER SLMB008 1.5 QT STAINLESS MIXING BOWL | 7/14/2010 | V | 20.00 | EA | 3.450 | 0.00 | 100.05 |
| THUSLMB004<br>THUNDER SLMB004 2.75 QT STAINLESS MIXING BOWL | 7/14/2010 | V | 113.00 | EA | 2.450 | 0.00 | 276.85 |
| TEK159008<br>TEKNOR 159-008 15X20X1/2 SANITUFF CUTTING BOARD | 7/14/2010 | V | 2.00 | EA | 41.610 | 0.00 | 83.22 |
| UPDLO030<br>UPDATE LOO-30 1-PC Ladle 3 oz PVC Handle | 7/14/2010 | V | 4.00 | EA | 2.090 | 0.00 | 8.36 |
| CARCT101469<br>CARLISLE CT101469 TRAY CAFE 10" X 14" CHOCOLATE | 7/14/2010 | V | 68.00 | EA | 0.950 | 0.00 | 64.60 |
| THUSLKCP008<br>THUNDER SLKCP008 China Cap COARSE MESH (S/S) | 7/14/2010 | V | 1.00 | EA | 12.950 | 0.00 | 12.95 |
| TRA49241313<br>TRAEX 4924L1313 COLORMATE DISPENSER 24 OZ CLEAR | 7/14/2010 | V | 33.00 | EA | 1.660 | 0.00 | 53.12 |
| CAM4SFSCW<br>CAMBRO 4SFSCW SQUARE 4QT CW | 7/14/2010 | V | 35.00 | EA | 6.260 | 0.00 | 219.10 |
| CAMSFC2<br>CAMBRO SFC2 SQUARE LID 2/4QT GREEN | 7/14/2010 | V | 84.00 | EA | 1.950 | 0.00 | 163.80 |
| CAR470903<br>CARLISLE 4709-03 TONGS UTILITY 9" BLACK | 7/14/2010 | V | 12.00 | EA | 2.090 | 0.00 | 24.96 |

COD -

A receipt and a 25% restocking fee is required for any returned items. All special order items are non-refundable.

TERMS : No Claims allowed - Unless Reported Within 5 Days
MERCHANDISE NOT RETURNABLE WITHOUT THIS SLIP.

THE FOREGOING  ACCEPTED AND ORDERED      RECEIVED THE ABOVE IN GOOD CONDITION

BY _____   BY _____

Printed on:  7/14/2010  3:33:22PM

|  | 0.00 |
|---|---|
|  | 1,133.58 |
|  | 0.00 |

Continued

Exhibit 6

# CHARLIE'S FIXTURES, INC.

**INVOICE**

3251 VENICE BLVD.
LOS ANGELES, CA 90006
PH#: (323) 731-0023
FAX: (323) 731-0318

**No. O0016700**

Date: 7/14/2010     Salesperson: Abigail

| BILL TO: | SHIP TO: |
|---|---|
| SALBOW<br>THE SALAD BOWL<br>350 N CANON DRIVE<br>BEVERLY HILLS, CA 90210 | MARK GANGLER<br>THE SALAD BOWL<br>350 N CANON DRIVE<br>BEVERLY HILLS, CA 90210 |

TITLE OF ALL MERCHANDISE LISTED HEREON SHALL REMAIN THE PROPERTY OF CHARLIE'S FIXTURES, INC. UNTIL FULL PURCHASE PRICE PAID. A CHARGE OF 1.5% PER MONTH WILL BE MADE ON ALL BALANCES OVER 30 DAYS OLD...

| YOUR ORDER NO. | | SHIP VIA | | F.O.B. POINT | | | TERMS | |
|---|---|---|---|---|---|---|---|---|
| | | OUR TRUCK | | | | | COD | |

| PART NUMBER / DESCRIPTION | EST. DATE | | ORDERED | UOM | UNIT PRICE | DISC % | EXTENDED PRICE |
|---|---|---|---|---|---|---|---|
| 31 CAM14CW135<br>CAMBRO 14CW135 FOOD PAN, PLASTIC, FULL SIZE | 7/14/2010 | V | 16 | EA | 14.500 | 0.00 | 232.00 |
| 32 CAM10CWCH135<br>CAMBRO 10CWCH135 FOOD PAN LID FULL SIZE | 7/14/2010 | V | 16 | EA | 9.500 | 0.00 | 152.00 |
| 33 CAR607004P<br>CARLISLE 607004P PAN PERF 4" DEEP ANT JAM | 7/14/2010 | V | 4 | EA | 10.000 | 0.00 | 40.00 |
| 34 IWNINS70M<br>WINCO INS-7 0.7 QT INSET, 9-1/8" DIA., S/S | 7/14/2010 | V | 1 | EA | 10.600 | 0.00 | 10.60 |
| 35 IWNINSH7<br>WINCO INSH-7 HINGED COVER FOR 7 QT. INSET, S/S | 7/14/2010 | V | 1 | EA | 5.500 | 0.00 | 5.50 |
| 36 WEBSW07S<br>WELBON SW-07S 7 QT. S/S SOUP WARMER | 7/14/2010 | V | 1 | EA | 89.000 | 0.00 | 89.00 |
| 37 NEM9046WBW<br>NEMCO 9046W-BW BUN WARMER, 36.5"X17.5", 1 DRWR, CAN DA | 7/14/2010 | V | 1 | EA | 769.000 | 0.00 | 769.00 |
| 38 CAM4SFSP<br>CAMBRO 4SFSP SQUARE 4QT PLY | 7/14/2010 | V | 48 | EA | 3.780 | 0.00 | 195.22 |
| 39 DELIVERY<br>DELIVERY CHARGES | 7/14/2010 | V | 1 | EA | 50.000 | 0.00 | 50.00 |

A receipt and a 25% restocking fee is required for any returned items. All special order items are non-refundable.

TERMS : No Claims allowed / Unless Reported Within 5 Days

MERCHANDISE NOT RETURNABLE WITHOUT THIS SLIP

THE FOREGOING, ACCEPTED AND ORDERED     RECEIVED THE ABOVE IN GOOD CONDITION

BY

| Sales Tax | 3,766.35 |
|---|---|
| Shipping & Handling | 0.00 |
| Total Misc. Charges | 0.00 |
| Sales Tax | 367.22 |
| | 4,133.58 |
| Deposit | 0.00 |
| **TOTAL** | **4,133.58** |

Printed on: 7/14/2010   3:33:22PM

PAGE

**033**

# CHARLIE'S FIXTURES, INC.

2251 VENICE BLVD.
LOS ANGELES, CA 90006
PHN : (323) 731-9023
FAX : (323) 731-0318



**INVOICE**

No. 00016789

Date: 7/14/2010     Salesperson: Abigail

| BILL TO: | SHIP TO: |
|---|---|
| SALBOW | MARK GANGLER |
| THE SALAD BOWL | THE SALAD BOWL |
| 350 N CANON DRIVE | 350 N CANON DRIVE |
| BEVERLY HILLS, CA 90210 | BEVERLY HILLS, CA 90210 |

TITLE OF ALL MERCHANDISE LISTED HEREON SHALL REMAIN THE PROPERTY OF CHARLIE'S FIXTURES, INC. UNTIL FULL PURCHASE PRICE PAID. A CHARGE OF 1.5% PER MONTH WILL BE MADE ON ALL BALANCES OVER 30 DAYS OLD. ALL STANDARD MERCHANDISE RETURNED MUST BE IN ORIGINAL CARTONS AND WILL CARRY A 25% RESTOCKING OR CANCELLATION CHARGE IF APPROVED. ALL APPROVED RETURNS WILL BE GIVEN IN STORE CREDIT. NO CASH REFUND WILL BE GIVEN. NO SPECIAL OR CUSTOM ORDERS MAY BE RETURNED OR CANCELLED UNDER ANY CIRCUMSTANCES. IN THE EVENT LITIGATION IS NECESSARY FOR EITHER PARTY TO ENFORCE ITS RIGHTS HEREUNDER, THE PREVAILING PARTY IN SUCH LITIGATION SHALL RECOVER REASONABLE ATTORNEY'S FEES. ALL SALES ARE CASH OR C.O.D. UNLESS OTHERWISE NOTED. C.O.D. PAYMENTS SHALL BE BY CASHIER'S CHECK OR CERTIFIED CHECK. MONTHLY STORAGE FEES WILL BE CHARGED BEGINNING ON THE 91st DAYS FROM THE INVOICE DATE. CHARLIE'S FIXTURES, INC. IS NOT LIABLE FOR ANY LOSS OF USE, FOODS SPOILAGE, OR PRODUCT LOSS UNDER ANY CIRCUMSTANCES, OR DELIVERY AND/OR INSTALLATION OF MERCHANDISE: 1) CUSTOMER MUST RETURN TO ACCEPT DELIVERY IN THE EVENT THAT THE CUSTOMER IS UNABLE TO TAKE DELIVERY AT THE ORIGINALLY AGREED TIME AND HAS NOT GIVEN CHARLIE'S FIXTURES, INC. REASONABLE NOTICE OF INABILITY, THERE WILL BE AN ADDITIONAL CHARGE FOR SECOND DELIVERY. 2) REMOVAL OF APPLIANCE BEING REPLACED IS SUBJECT TO ADDITIONAL CHARGE. 3) CHARLIE'S FIXTURES, INC. WILL NOT SET CASE COUNTERS OR RAILINGS. 4) CHARLIE'S FIXTURES, INC. WILL NOT BE RESPONSIBLE FOR ANY DAMAGE TO CUSTOMER'S PROPERTY AND MERCHANDISE DELIVERED AND/OR INSTALLED BY CHARLIE'S FIXTURES, INC. AT CUSTOMER'S RISK. AND 5) MERCHANDISE PICKED-UP AT CHARLIE'S FIXTURES, INC. WAREHOUSE WILL BE LOADED AT CUSTOMER'S RISK. CUSTOMER IS RESPONSIBLE FOR FILING CLAIMS FOR FREIGHT DAMAGE WITH CARRIER.

| YOUR ORDER NO. | | SHIP VIA | | F.O.B. POINT | | TERMS | |
|---|---|---|---|---|---|---|---|
| | | OUR TRUCK | | | | COD | |

| | PART NUMBER - DESCRIPTION | EST. DATE | QTY ORDERED | UOM | UNIT PRICE | DISC % | EXTENDED PRICE |
|---|---|---|---|---|---|---|---|
| 21 | RUB7590SS | 7/14/2010 | 1.00 | EA | 73.000 | 0.00 | 73.00 |
| | RUBBERMAID 7590-88-35qt WAVEBRAKE SIDE PRESS COMBO YEL BRN | | | | | | |
| 22 | WINWCS25 | 7/14/2010 | 2.00 | EA | 5.060 | 0.00 | 10.12 |
| | WINCO WCS-25 WET FLOOR CAUTION SIGN, YELLOW | | | | | | |
| 23 | WINCHH101N | 7/14/2010 | 1.00 | EA | 38.950 | 0.00 | 38.95 |
| | WINCO CHH-101A Hi-Chair, stacking, natural wood finish | | | | | | |
| 24 | THUPLDP346 | 7/14/2010 | 1.00 | EA | 8.030 | 0.00 | 8.03 |
| | THUNDER PLDP346 13" LOBBY DUSTPAN | | | | | | |
| 25 | SANKP97RD | 7/14/2010 | 6.00 | EA | 3.450 | 0.00 | 20.70 |
| | SAN JAMAR KP97RD  Kleen-Pail™: 3 qt. plastic; red | | | | | | |
| 26 | RUB1905 | 7/14/2010 | 6.00 | EA | 3.950 | 0.00 | 23.70 |
| | RUBBERMAID 1905 SCRPAER 13 1/2" | | | | | | |
| 27 | DYNSD99 | 7/14/2010 | 1.00 | EA | 89.000 | 0.00 | 89.00 |
| | DYNAMIC SD99 MANUAL SALAD SPINNER | | | | | | |
| 28 | THUCMEP2449 | 7/14/2010 | 16.00 | EA | 13.000 | 0.00 | 198.00 |
| | THUNDER CMEP2449- 24 x 49 Epoxy Coating Wireshelves | | | | | | |
| 29 | THUCMPC072 | 7/14/2010 | 12.00 | EA | 4.210 | 0.00 | 50.52 |
| | THUNDER CMPC072 74" CHROME POST | | | | | | |
| 30 | JIMEWT3048 | 7/14/2010 | 1.00 | EA | 108.000 | 0.00 | 108.00 |
| | JIMEX EWT-3048 ECONOMY KID WORKTABLE 30" X 48" | | | | | | |

A receipt and a 25% restocking fee is required for any returned
items  All special order items are non-refundable

0.00

TERMS : No Claims allowed  Unless Reported Within 5 Days
MERCHANDISE NOT RETURNABLE WITHOUT THIS SLIP

1,133.58

0.00

THE FOREGOING, ACCEPTED AND ORDERED      RECEIVED THE ABOVE IN GOOD CONDITION

BY _____

Continued

Printed on: 7/14/2010  3:33:22PM

PAGE 1

**034**

# CHARLIE'S FIXTURES, INC.

2251 VENICE BLVD.
LOS ANGELES, CA 90006
PHN : (323) 731-9023
FAX : (323) 731-0318

**INVOICE**

**No. O0016780**

Date: 7/14/2010       Salesperson: Abigail

| BILL TO: | SHIP TO: |
|---|---|
| SALBOW | MARK GANGLER |
| THE SALAD BOWL | THE SALAD BOWL |
| 350 N CANON DRIVE | 350 N CANON DRIVE |
| BEVERLY HILLS, CA 90210 | BEVERLY HILLS, CA 90210 |

TITLE OF ALL MERCHANDISE LISTED HEREON SHALL REMAIN THE PROPERTY OF CHARLIE'S FIXTURES, INC UNTIL FULL PURCHASE PRICE PAID. A CHARGE OF 2.5% PER MONTH WILL BE MADE ON ALL BALANCES OVER 30 DAYS OLD. ALL STANDARD MERCHANDISE RETURNED MUST BE IN ORIGINAL CARTONS AND WILL CARRY A 25% RESTOCKING OR CANCELLATION CHARGE IF APPROVED. ALL APPROVED RETURNS WILL BE GIVEN IN STORE CREDIT. NO CASH REFUND. WILL BE GIVEN. NO SPECIAL OR CUSTOM ORDERS MAY BE RETURNED OR CANCELLED UNDER ANY CIRCUMSTANCES. IN THE EVENT LITIGATION IS NECESSARY FOR EITHER PARTY TO ENFORCE THEIR RIGHTS HEREUNDER, THE OFFICER WHO PARTY IN SUCH LITIGATION SHALL RECOVER HIS REASONABLE ATTORNEY'S FEES... SALES ARE CASH OR C.O.D UNLESS OTHER PRIOR ARRANGEMENTS... C.O.D PAYMENTS SHALL BE BY CASHIER'S CHECK OR CERTIFIED FUNDS. MONEY... STORAGE FEES WILL BE CHARGED BEGINNING ON THE 31ST DATE FROM THE INVOICE DATE. CHARLIE'S FIXTURES, INC. IS NOT LIABLE FOR ANY LOSS OF USE, FOOD SPOILAGE, OR PRODUCT LOSS UNDER ANY CIRCUMSTANCES OR OF ANY AND/OR INSTALLATION OF MERCHANDISE) IN CUSTOMER MUST RETURN TO CHARLIE'S FIXTURES. IN THE EVENT THAT THE CUSTOMER IS UNABLE TO TAKE DELIVERY WITHIN ORIGINALLY AGREED TIME AND HAS NOT GIVEN CHARLIE'S FIXTURES... REASONABLE NOTICE OF INABILITY THERE WILL BE AN ADDITIONAL CHARGE FOR STORING DELIVERY, IF REMOVAL OF APPLIANCE BEING REPLACED IS SUBJECT TO ADDITIONAL CHARGES. CHARLIE'S FIXTURES, INC. WILL NOT BE LIST OVER COUNTERTOP HAS BEEN. CHARLIE'S FIXTURES, INC. WILL NOT BE RESPONSIBLE FOR ANY DAMAGE TO CUSTOMER'S PROPERTY AND MERCHANDISE DELIVERED AND/OR INSTALLED BY CHARLIE'S FIXTURES, INC. AT CUSTOMER'S RISK AND ALL MERCHANDISE PICKED UP AT CHARLIE'S FIXTURES, INC. WAREHOUSE WILL BE LOADED AT CUSTOMER'S RISK. CUSTOMER IS RESPONSIBLE FOR FILING CLAIMS FOR FREIGHT DAMAGE WITH CARRIER.

| YOUR ORDER NO. | SHIP VIA | F.O.B. POINT | TERMS |
|---|---|---|---|
| | OUR TRUCK | | COD |

| PART NUMBER / DESCRIPTION | EST. DATE | QTY SHIPPED | UOM | UNIT PRICE | DISC % | EXTENDED PRICE |
|---|---|---|---|---|---|---|
| 11  CAR450003 | 7/14/2010  V | 36.0 | EA | 2.080 | 0.00 | 72.80 |
| CARLISLE 4600-03 TONGS SALAD 9" BLACK | | | | | | |
| 12  CAR460005 | 7/14/2010  V | | EA | 1.660 | 0.00 | 19.92 |
| CARLISLE 4606-05 TONGS SALAD 6" RED | | | | | | |
| 13  CAR460006 | 7/14/2010  V | | EA | 1.660 | 0.00 | 19.92 |
| CARLISLE 4606-06 TONGS SALAD 6" BEIGE | | | | | | |
| 14  CAR1064202 | 7/14/2010  V | | EA | 20.360 | 0.00 | 81.44 |
| CARLISLE 10642-02 FOOD BOX 26x18x9 DEEP WHITE | | | | | | |
| 15  CAR34202323 | 7/14/2010  V | | EA | 29.710 | 0.00 | 118.84 |
| CARLISLE 342023-23 TRIMLINE WASTE CONTAINER 23 | | | | | | |
| 16  CAR34202423 | 7/14/2010  V | | EA | 20.360 | 0.00 | 40.72 |
| CARLISLE 342024-23 TRIMLINE WASTE LID SWING TOP GREY | | | | | | |
| 17  EDL11100 | 7/14/2010  V | | EA | 94.950 | 0.00 | 94.95 |
| EDLUND 11100 #1 CAN OPENER | | | | | | |
| 18  CAR34101002 | 7/14/2010  V | | EA | 12.000 | 0.00 | 12.00 |
| CARLISLE 341010-42 10gal WASTE CONTAINER WHITE | | | | | | |
| 19  SANSI7000 | 7/14/2010  V | | EA | 30.560 | 0.00 | 30.56 |
| SAN JAMAR SI7000 Saf-T-Ice® Tote; 12 - 16 OZ. | | | | | | |
| 20  APWW3V | 7/14/2010  V | | EA | 139.000 | 0.00 | 139.00 |
| APW W3V 12" X 20" COUNTERTOP WARMER | | | | | | |

A receipt and a 25% restocking fee is required for any returned
items. All special order items are non-refundable

TERMS : No Claims allowed. Unless Reported within 5 Days
MERCHANDISE NOT RETURNABLE WITHOUT THIS SLIP

| | |
|---|---|
| | 4,133.56 |
| | 0.00 |

THE FOREGOING, ACCEPTED AND ORDERED   RECEIVED THE ABOVE IN GOOD CONDITION   Continued

BY _____

Printed on: 7/14/2010  3:33:22PM

**035**

**Bank of America**

No. 427512564

Cashier's Check

11-35/1210
NCA

Notice to Purchaser - In the event this check is lost, misplaced or stolen, a sworn statement and 90-day waiting period will be required prior to replacement. This check should be registered within 90 days.

Banking
Center          BEVERLY WILSHIRE

Date          AUGUST 04, 2010

                0006213  00001   007512564

                                    THE SALAD BOWL FRANCHISE
                                    Remitter (Purchased By)

Pay    **FOUR THOUSAND ONE HUNDRED THIRTY THREE DOLLARS AND 56 CENTS**

                                                    $   **4133.56**

To
The
Order     **CHARLIES FIXTURES, INC.**
Of        ****

                    VOID AFTER 90 DAYS

                                    Non-Negotiable

                                    Authorized Signature

Bank of America, N.A.
San Francisco, CA

                                    Customer Copy          1397085076
                                    Retain For Your Records

05-14-3774B  01-2009

036